**Application of PEPPERS REFINING CO.**

No. 36054.

Supreme Court of Oklahoma.

April 13, 1954.

Rehearing Denied June 15, 1954.

As Corrected July 1, 1954.

Application for Leave to File Second Petition for Rehearing Denied July 7, 1954.

Barth P. Walker, Hill & Godfrey, By Houston Bus Hill, Wayne W. Bayless, Oklahoma City, for plaintiff in error.

James B. Diggs, Jr., Booth Kellough, Tulsa, for Gulf Oil Corp.

Floyd Green, Oklahoma City, for Corporation Commission.

T. Murray Robinson, Oklahoma City, and J. A. Rinehart, El Reno, for Harper-Turner Oil Co.

BLACKBIRD, Justice.

This appeal involves well-spacing in an area underlying an oil pool or common

source of oil supply comprised of large portions of four adjoining sections of land, known as the "Peavine Field" of Oklahoma County, Oklahoma. The sections involved are 2, 3, 10 and 11 of Township 14 North, Range 2 West.

On October 9, 1951, the Corporation Commission, by Order No. 25155, issued in its Cause CD No. 3372, prescribed 20-acre well-spacing units for the only portions of those sections then apparently indicated as overlying said pool. The well-spacing plan thereby prescribed authorized the drilling of only one well on each twenty acres, to be located in the center of one of the two 10-acre tracts comprising the unit. According to the drilling pattern thereby established, the well locations were to vary from northwest to southeast in each alternate unit, beginning at the northwest corner of the area and running from north to south down each tier of units, so that the most northwesterly unit in the area was to have its well located in the center of its W/2, while the one directly adjoining it on the south would have its well in its E/2, etc., with there being a well in the Northwest 10-acres and another well in the Southeast 10-acres of each 40-acre square area in the field. Exceptions were made to this drilling pattern, however, in the instance of eight wells already drilling or completed that had not been located in conformity with this pattern. These wells were indicated by black dots with the abbreviation "Ex" and a small arrow pointing to them on a plat of the area marked "Exhibit 'A'", attached to the Order and depicted below on what we shall hereinafter refer to as: "Map 1". It will be noted from this map that most of

EXHIBIT "A"
Corp Com Order No. 25155
CD 3372 9 Oct 51
20 acre Spacing (NW & SE)
Wilcox Sd
Pea Vine Pool, Okla. Co.

R 2 W

MASON CHRISTIAN LARSEN

MAP 1.

418

the 40-acre areas shown thereon are divided into two 20-acre spacing units by a line running horizontally across them, but that two of those depicted with "Exception" locations thereon, are shown to be divided into such units by vertical lines. In other words, most of such tracts are split in half, leaving a North unit and a South unit, but those two 40-acre tracts are divided into an East 20-acres or unit and a West 20, or unit.

No appeal was taken from the above described Order (No. 25155) but approximately three months later, or on January 11, 1952, the Commission, upon the application of F. E. Harper and Roy J. Turner, indicated by the name "Harper-Turner" on Map 1 to be the lessees (among other tracts) of the SW/4 of Section 2, allowed them by Order No. 25458, as another exception to the general drilling pattern established by the original well-spacing order, to drill a well in the center of the NE/4 of the SE/4 of the SW/4 of Section 2 (at the location designated by the letter "U" on Maps 2 and 3, infra) instead of in the NW/4 or 10 acres of said quarter quarter-section, as contemplated in the original order.

### STRUCTURE OF SECOND WILCOX SAND IN PEAVINE POOL
### AS THOUGHT TO BE IN JULY, 1952, WHEN ORDER
### No. 26093 WAS ENTERED

LEGEND:

o Second Wilcox Sand Well

• Excepted Wilcox Sand Well

Δ Bartlesville Sand Well

⊕ Dually completed Bartlesville Sand Well and excepted Wilcox Sand Well

Water Line, at edge of structure.

MAP 2.

STRUCTURE OF 2nd WILCOX SAND
AT THE TIME OF HEARING ON
PEPPERS' APPLICATION
(See CD No. 4328)

Figures indicate depth at which 2nd Wilcox Sand is encountered.

MAP 3.

Subsequently, on March 28, 1952, by Order No. 25925, in its Cause CD No. 3900, on the application of Mazda Oil Corporation, one of the lessees, with Harper-Turner and others, of the N/2 of the NE/4 of Section 11, shown on Maps 2 and 3 as the Harper-Turner Santee "A" lease, the Commission made another exception to the field's original spacing pattern by authorizing said lessees to produce from the second Wilcox sand, a well they had commenced as a Bartlesville sand well but had deepened to that lower sand. This well is shown by the symbol "⟁" and letter "V" on Maps 2 and 3 to be located in the NE/4 of the NW/4 of the NE/4 of Section 11. It will be noted from Map 1 that the original spacing order divided the NW/4 of said quar-

ter-section into two 20-acre spacing units by a line running east and west through said quarter-section, but this new order (No. 25925) changed this arrangement and divided said tract into such units by a line running north and south through it, as can be seen by reference to Maps 2 and 3.

Thereafter, on July 7, 1952, by Order No. 26037, in Cause CD No. 3941, the Commission, upon evidence that the second Wilcox sand extended farther south than originally believed, extended the area covered by the field's original well-spacing order, to include the SE/4 of the SE/4 of Section 10, and the SW/4 of the SW/4, and the NE/4 of the SW/4 of Section 11, as shown by the 20-acre spacing units outlined on the lower part of Maps 2 and 3 that do not appear on Map 1. This order specifically described, recognized and reiterated the eight well locations that had been made exceptions to the general drilling pattern originally prescribed for the field (by Order No. 25155), and, in addition, recognized two more exceptions thereto that had been made since the original Order and, in addition, allowed an eleventh Exception at the location designated by the letters "AA" on Maps 2 and 3, in the following words:

"* * *; that the Harper-Turner No. 1 Larsen Well drilled at a point 165 feet from the north and west lines of the N/2 of the NE/4 of the SW/4 of Section 11 was drilling at the time the application to extend the area in this matter was filed, and an exception should be made for said well and said well should be the permitted well for the unit on which it is located."

Subsequently, on July 28, 1952, the Commission, by Order No. 26093, in its Cause CD No. 3872, on application of Gulf Oil Corporation, made another or twelfth exception to the original spacing pattern by authorizing said lessee to drill its well, for the unit described as the S/2 of the NW/4 of the SW/4 of Section 11, in the center of the West 10 acres of the unit, rather than in the center of the East 10 acres, as provided in the field's original spacing order.

Sometime before beginning the present proceeding, Peppers Refining Corporation, sometimes referred to herein as "Peppers", drilled a well to the Bartlesville Sand in the center of the SE/4 of the SW/4 of the SE/4 of Section 2, on its Teuscher lease as indicated by one of the small triangle symbols on Maps 2 and 3. Upon exploring deeper Peppers discovered that by drilling this well deeper it would encounter and could produce from the Second Wilcox Sand, at a depth of approximately 5080 feet. Accordingly, it was with the idea of making this well a so-called "dual producer", (to produce from both the Bartlesville and the Second Wilcox Sand through the same hole) as Harper-Turner, Mazda Oil Corp., and their co-lessees had been allowed to do on their Santee "A" lease adjoining Peppers' Teuscher Lease on the south, that Peppers commenced the present proceeding. Its pleadings were drawn in the form of an "Application" and "Amended Application" filed with the Commission for an order authorizing the drilling of an additional well (to make a total of 2 wells to the Wilcox Sand) on each of the 20-acre spacing units already authorized for the entire Peavine Field, and praying for "such further relief * * * as is just, reasonable and equitable in the premises."

At the hearing the Commission held on its application, Peppers was joined in supporting it by certain royalty owners, including Mrs. Jeanne Cox, Izvesta Shannon and Ed Markwell. The named three apparently own royalty under Gulf Oil Corporation's Cox lease covering the S/2 of the NW/4 of Section 11. Gulf joined Harper-Turner in opposing Peppers' application. At the close of the hearing, the application was denied by the Commission's Order No. 26994. Among the findings constituting the basis for the Order, the ones which furnish the most insight into the highly controversial issues before the Commission, are as follows:

"3. That the Corporation Commission established 20 acre drilling and spacing units by Orders numbered 25155 and 26037, for the production of

oil and gas from the Wilcox Sand common source of supply in the Peavine Field, located in Oklahoma County, Oklahoma, in the year, 1951; that at the time said Orders were issued, eight exceptions were made as to the location of the permitted well because such wells had theretofore been drilled on patterns at locations other than that provided for in said Orders; That subsequent to the issuance of said Orders the Corporation Commission, in at least 4 instances, granted exceptions to the locations provided for in the two drilling and spacing Orders, so as to permit operators to change to locations of the permitted wells to be drilled in said field, in each instance finding that the drilling of said wells in the manner authorized by said exception Order fully protected the correlative rights of all of the owners of said common source of supply.

"4. That the granting of this application would authorize the drilling of an additional well in each drilling and spacing unit, and the Commission is of the opinion that the economically recoverable oil and gas produceable from said common source of supply will be recovered through the wells heretofore drilled and authorized by such spacing Orders and the drilling of additional wells is not necessary to recover the oil and gas from said reservoir and would therefore constitute waste as defined by the Statutes of Oklahoma.

"5. That the evidence introduced by applicant is insufficient to indicate any substantial change in the facts considered by the Commission in the granting of the original spacing Orders and the exception Orders hereinabove referred to and therefore such Orders should not be amended or modified as requested by applicant."

From the above described Order, Peppers, the only party mentioned in the Petition in Error, has perfected the present appeal as plaintiff in error. It will hereinafter usually be referred to as: "Applicant." It is opposed by Harper-Turner Oil Company, Gulf Oil Corporation and the Corporation Commission, including its individual members, as defendants in error. They will be referred to collectively as: "Protestants." All further reference to the individual oil and refining company lessees will be by the first word of their names and to the Corporation Commission individually, merely as: "The Commission."

Early in the hearing before the Commission, as in the argument here, it was recognized and conceded that since Peppers had not appealed from the previous spacing Orders made for the field and its present proceeding constituted an effort to obtain the vacation, amendment, and modification of said previous Orders, some change of condition or factual situations in the field would have to be shown as required by the rule laid down by this Court in Wood Oil Co. v. Corporation Commission, 205 Okl. 534, 239 P.2d 1021, as follows:

"The Corporation Commission is without authority to entertain or grant an application to vacate, amend or modify a spacing and well drilling unit established by a former order of the Commission, which has become final, in the absence of a showing of a *substantial change of condition* in the area, since the former order was made *or other change of factual situations* specified in the statutes." (Emphasis added.)

Just what changes are contemplated in the expressions emphasized in the above quotation became one of the pivotal questions in the controversy, along with the question of whether the evidence introduced before the Commission was sufficient to meet such requirements. At least one or two of the attorneys participating in the hearing seemed, by their expressions, to recognize that the terms referred to might include a change in or addition to *what is known* about a given oil or gas reservoir or common source of supply, but other opinions voiced at the hearing indicated some belief that the rule contemplates that before the original spacing pattern can be changed,

conditions in the reservoir itself must have changed from what they were when it was deposited there by Nature. In accord with its theory of the meaning of the rule, the Applicant introduced contour maps as exhibits and much other evidence in an effort to show, not only that the size, shape and thickness of the Second Wilcox Sand at various places in the field is now known to be different from what they were thought to be at the time Orders No. 25155 and 26037 were entered, but it also introduced evidence, not seriously disputed, that drainage patterns under some of the units in the field had been materially changed by the exceptions which the Commission had, by Orders Numbered 25458, 25925, 26037 and 26093, made to the drilling pattern originally established by Order No. 25155. On Map 2 we have attempted to portray, at least in a crude or approximate manner, the contours of the Second Wilcox Sand shown on Exhibit 43, which was introduced at the hearing, as evidencing, among other things, how said sand structure was thought to underlay the area at the time the Commission entered Order No. 26093, making an exception to the original drainage pattern, of the Harper-Turner Well "AA", in Section 11, and extending the original spacing pattern in Sections 10 and 11. On Map 3, we have attempted to picture said structure as outlined on Exhibit 31, showing how geologists' ideas of the structure's contours, size and shape had changed on the basis of information gained from additional explorations undertaken since said Order was entered. Some of the salient changes in the pattern of the structure brought about by this more current information that are pointed out by Applicant are the bulges in the 5080-foot contour in the NE/4 of Section 11, and the NW/4 of Section 2. Thus it appears that the location of Well "U", which Harper-Turner obtained the Commission's permission, by Order No. 23458, to move from the location prescribed in the original spacing order (namely: The center of the W/2 of the 20-acre unit described as the N/2 of the SE/4 of the SW/4 of Section 2) to the center of the E/2 of the same unit upon the representation and theory that the Second Wilcox Sand dipped and formed a trough under the west portion of said unit, would have been just as high, if not higher, on the structure had it been drilled as first prescribed, as it turned out to be when drilled on its excepted present location. It is also pointed out that in the light of what is now known concerning the contours and position of the structure as shown on Map 3, Well "V", instead of encountering the top of the Second Wilcox Sand below the 5080 foot depth, actually, when drilled, encountered it at 5074 feet and is just as high, or higher, on the structure than Peppers' well at "D". Applicant also points out that because of the exceptions that have been made to the original spacing pattern, virtual 10-acre well spacing has been put into operation along the west and south sides of the Peppers' Teuscher Lease with six Harper-Turner Second Wilcox Sand wells offsetting this lease, on which Peppers has only three wells drilled to said Sand; and that a similar situation exists with reference to Gulf's Cox Lease in the S/2 of the NW/4 of Section 11. Evidence, not seriously disputed, was introduced to show that wells high on the Second Wilcox Sand structure enjoy a substantial advantage in production over wells drilled at locations lower on the structure, and the evidence as a whole reasonably tends to show that a well which penetrates this structure in or near its top, or dome, drains a wider area than one located farther down on the structure. This supported Peppers' theory that Harper-Turner's Well "V", drilled at the point where it was located, would definitely drain oil from under Peppers' Teuscher Lease, whereas this probably would not have occurred (at least for many years) if it had been drilled at the originally prescribed location in the unit. It also supported its theory that the drainage patterns in the Field reasonably to be contemplated under the original drilling pattern set up by Order No. 25155 had been naturally changed by the Commission's permitting the drilling of Wells "U", "V" and "J" nearer said lease than contemplated in said original order. The hereinbefore named owners of royalty under Gulf's Cox Lease attempted a similar showing with reference to the drainage from under that lease, brought about by the Commission's permitting Har-

per-Turner, in its Order No. 26037, to drill its Well "AA" only 165 feet south of the southern boundary of that lease, rather than 330 feet away from that line as it would have been drilled if located in conformity with the general drilling pattern first authorized by Order No. 25155. (In connection with the latter well it is noted, however, that the Commission recognized such drainage, to the extent of restricting its allowable to 75% of the normal allowable in the Field.) It was established, and apparently conceded by all, that the closer a well is to another lease, the more oil it will naturally drain from that lease, barring obstructions to permeability that some testified, and all apparently conceded, the structure in question does not have. It seems to be Protestants' theory, however, that the drainage which the Peppers' Teuscher Lease would suffer from Harper-Turner's Well "V" would be compensated by the oil Peppers could drain from Harper-Turner's NE/4 of the SW/4 of Section 2, by the drilling of a well in the most northwesterly unit of its said Teuscher lease. While it is true that their witness, Dr. Knappen, gave an answer which, if looked at out of context, without noticing the question it was given in answer to, would seem to support Protestants' theory, an examination of all that part of his testimony from which that answer is removed and set out by itself in Protestants' brief, shows that this answer was qualified in such a way that it tends to support Applicant's theory that the drainage from Well "V" could *not* be *fully* compensated by drilling the above described location authorized in the original spacing order. The testimony in question is shown by the following excerpts from the record:

"Q. Now, when and if Mr. Peppers drills a well which he already has authority to drill in the northwest corner there, will this lease then, the Teuscher lease then enjoy a similar slight drainage advantage to the Harper-Turner lease described as the Harper-Turner Teuscher? A. Yes.

"Q. So that he will have an advantage in this well which is equal to any detriment which he may suffer in re-spect to his Mazda No. 4 location? A. *If they are comparable wells,* he will; yes, sir.

"Q. Is there anything at this time in the development or knowledge in the field at this time to indicate that there will be any discrepancy between the wells? A. *Yes; the northwest location on the Peppers lease is a trifle lower than.* * * *

"Q. It is somewhat lower than the location * * * now, *other than that,* he would have the same uncompensated drainage advantage in this northwest 10-acres which he says he suffers in respect to the southeast 10 of the southwest quarter? A. It would be exactly the same advantage in one case, as it is a disadvantage in the other." (Emphasis added.)

We think that when the above testimony is viewed in its true light, it is obvious that the witness was trying to say that the drainage of a new well in the location referred to would not *fully* compensate for the Harper-Turner Well's drainage from under the Peppers' lease. And, we have examined the entire record of more than seven hundred pages and do not find any substantial evidence to support a conclusion that Peppers' right to the oil under its Teuscher Lease is protected against drainage through Harper-Turner's Well "V" or that such drainage is fully compensated for, in any way or from any source. If the field were unitized so that presumably, at least, each owner of mineral rights in land overlaying the Second Wilcox Sand would share ratably in the total production from this common reservoir in proportion to the number of acre-feet of said sand underlaying his land, then the situation presented here would not, at least theoretically, arise. But, as far as the record shows this field has never been unitized.

In the order appealed from, the Commission made no finding as to correlative rights, contenting itself with a mere reference to its previous orders granting exceptions to the original drainage pattern that did contain such findings. We do not know what evidence, if any, such recited

findings had to support them. All of the evidence in those proceedings was of course not re-introduced in the present one. We do not believe that such findings in all of such orders are material or can now be any longer relied upon in view of conditions in the field as they are currently known or believed and shown, to exist. A comparison of Maps 2 and 3 furnishes some graphic evidence that conditions in the Second Wilcox Sand of the Peavine Field are not now the same as they were believed to be at the time the Commission entered its Order No. 26037, extending the field's well-spacing boundaries and its Order No. 25925, allowing Harper-Turner, Mazda, et al, to produce its Well "V", which latter order contained the rather equivocal or uncertain finding, that "it is not *likely* that the correlative rights of adjoining lease and mineral owners will be adversely affected by such change in location or that said well will recover more oil than in underlying the unit upon which it is located." If said well had been as far down the side of the structure as it was apparently first thought to be, and indicated on Exhibit 43 and Map 2, rather than penetrating such structure near its top or about 5080 feet, as it is shown to have done by Exhibit 31 and Map 3, then perhaps it would not have been "likely" to drain oil from Peppers' Teuscher Lease, but the fact remains that, as geologists now portray this structure, and on the basis of the proof in this case, that well does drain oil from under that lease, and, without unitizing or "pooling", there was no way established by the evidence that Peppers can adequately protect itself against such drainage except by being allowed to drill an offset well.

 It must be apparent from the foregoing that we have concluded and must herein hold that the evidence introduced in the present case was sufficient under the rule in Wood Oil Co. v. Corporation Commission, supra, to authorize (if not to require) vacation, modification or amendment of the Commission's previous orders directing 20-acre well-spacing in the field. To hold that the Commission could never modify a well-spacing pattern established by a previous order not appealed from, upon a showing of characteristics about a common source of supply, and the withdrawals therefrom, that were not known or anticipated at the time of the original order, would "tie the hands" of the Commission and often prevent it from performing its statutory duties under our Oil and Gas Conservation Act, Title 52 O.S.1951 § 81 et seq. It may be good policy for the Commission, in initially considering the well-spacing of a new field, about which the geological data is not complete or is subject to revision after further exploration, to proceed with caution and prescribe that the wells be located comparatively far apart, but, if after such further exploration and procurement of more authentic information, the Commission could not decrease the size of the spacing units or increase the density of the well locations, it might be powerless, not only to effectively prohibit inequities or encroachments as to correlative rights in a common reservoir, but also, powerless to prohibit some of the various types of waste, and more particularly that which has been denominated in the above Act "Underground Waste", leaving underground oil which any prudent operator would not hesitate to drill for, if permitted to do so.

The next question which presents itself is: Was the evidence in the present case sufficient to *entitle* Applicant to relief against the inequities shown herein? What we have already said indicates that there was a sufficient showing that some action on the part of the Commission is necessary to protect its correlative rights in the production of the field.

 In our opinion it is more important to secure to each lessor, lessee, and owner of mineral rights in a field, his ratable share of the production therefrom and to prevent underground waste, than it is to secure to some, the maximum profits from drilling and producing operations. In view of the evidence in this case, we think the Commission gave undue consideration to what it apparently termed "economic waste", to the detriment of other and more important considerations, including the correlative rights of the various owners of interests in the common reservoir. We have therefore concluded that

its order denying Peppers any relief was error. On the basis of the evidence it is clearly entitled to be protected against the drainage of oil from under its C. Teuscher Lease that was definitely proved to be occurring. The form of such protection we do not attempt to prescribe. (The Conservation Act specifically gives the Commission adequately broad power to grant such protection in more than one way or form). We merely hold that the pleadings and proof herein were sufficient to invoke, and entitle Peppers to, the exercise of that power. No real and successful effort was made to establish that the correlative rights of *all* owners in the field were being violated by 20-acre spacing, but this constitutes no obstacle to granting appropriate relief to owners of mineral rights who are proved to be so affected.

Accordingly, the Order appealed from is hereby reversed and the present proceeding is remanded to the Corporation Commission with instructions to vacate same and proceed in a manner not inconsistent with the views herein expressed.