**PHILLIPS PETROLEUM COMPANY,**
**Plaintiff in Error,**

**v.**

**CORPORATION COMMISSION of the State**
**of Oklahoma and Yingling Oil, Inc.,**
**Defendants in Error.**

**No. 42060.**

Supreme Court of Oklahoma.

Nov. 12, 1969.

Wm. J. Zeman, Lloyd G. Minter; Bartlesville, Edward J. Fauss, Galen E. Ward, Oklahoma City, for plaintiff in error.

McPherson & Buckingham, by John C. Buckingham, Oklahoma City, for Yingling Oil, Inc., defendant in error.

BERRY, Vice Chief Justice.

The principal question concerns the sufficiency of evidence to support the Corporation Commission's modification of its prior order, deleting a producing gas well from a common source of supply. Procedural and factual matters not essential to the issues involved will be to a great extent minimized or omitted.

A brief history shows the outer perimeter of the involved area was established by drilling of Yingling-Wiggins # 1 to the north. The southern and western perimeters already had been established by earlier drilling. Subsequently wells were drilled in between the wells on the perimeter.

The controversy arose after plaintiff in error, hereafter referred to as Phillips, applied for and obtained 640 acre spacing units in the entire Morrow formation in Townships 1 and 2 North, Range 14 and 15 ECM, Texas county, Oklahoma, under Order No. 58465, dated March 31, 1965. The effect of this extension order was to place the defendant in error's (hereafter referred to as Yingling) Wiggins # 1 (drilled 12/62) in Section 10, Township 2N, Range 15E, under the prior spacing order and field rules affecting Morrow Zone gas production of the wells to the south and southwest. Phillips owned and operated a large number of the other wells in the field. Application of these field rules resulted in Yingling's allowable being cut in half, but in conformity with the allowable on the Phillips' wells.

After realizing the effect of the field rules Yingling applied (October 1965) for amendment to Order No. 58465, and prior orders, insofar as these orders spaced the Upper Morrow Zone as a common source of supply in 16 sections in the area. The application sought to establish another 640 acre spacing unit out of the 16 sections, which would include section 10 (Wiggins # 1) and 5 other sections. The primary purpose was to re-establish its prior allowable stricken by Order No. 58465. Yingling also sought an underage allowance to reinstate for the overage charged under the then existing field rules.

After hearing the application in February 1966 the Commission entered its Order No. 62166. Yingling was denied underage, but the Commission modified Order No. 58465 and prior and subsequent orders. The Commission found Order No. 51679 (1/9/63) had established 640 acre spacing units in 12 sections (including Wiggins # 1 in Section 10) as a common source, and that the Wiggins # 1 was dually completed to produce separately from the Upper Morrow Sand and Lower Morrow Sand in compliance with Order

No. 51679. The Commission further found that in vacating Order No. 51679 by Order No. 58465 the two Morrow formations in the Wiggins # 1 were treated as one common source of supply.

The Commission then determined there had been a change of condition since the entry of Order No. 58465, and that the Upper Morrow Sand common source of supply found in the Wiggins # 1 was a separate common source as previously determined. The Commission Order No. 58465 was amended by deleting the Upper Morrow Sand common source of supply in 4 sections (including Wiggins # 1 in section 10). The Wiggins # 1 was the only production in the 4 sections deleted.

In appealing from this order Phillips advances 3 propositions. The propositions attack the right of the Corporation Commission to delete a portion of a gas field from a previously determined common source of supply, unless shown by substantial evidence that there had been a change of conditions, or knowledge of conditions, to support such order of modification. Phillips contends Yingling had the burden to show, by substantial evidence, that new knowledge had been acquired, or there had been a change of conditions since the prior order had been entered, and that Yingling had failed to show a scintilla of evidence upon which the Corporation Commission predicated the order from which this appeal is taken.

The following facts are not in dispute: The Upper and Lower Morrow are naturally separate and distinct sources of supply, but are now in pressure communication by the commingling of the two zones in many wells in the area. Yingling-Wiggins # 1 and Skelly-Wiggins wells are dually completed, while all of the Phillips wells which lie to the south and southwest were commingled. No additional drilling has occurred since Order No. 58465 (3/31/65) from which any evidence could be derived to show a change in conditions, or knowledge of conditions. The Morrow Zone allowable was calculated upon a formula composed of acreage and pressure. Both parties developed and completed their wells in compliance with procedures and orders of the Corporation Commission.

Phillips contends a spacing order cannot be vacated by a subsequent order absent showing by substantial evidence of a change of condition, or change in knowledge of conditions, in the area since the former order was entered. After citing 52 O.S.1961, § 111, it is urged any attempt to vacate or modify a prior final order, absent such substantial evidence, would constitute a collateral attack upon the final order and as such would be prohibited. See Wood Oil Co. v. Corp. Comm., 205 Okl. 534, 239 P.2d 1021, and other cases of similar effect.

Yingling's position, based upon Application of Bennett, Okl., 353 P.2d 114, is that Commission's Order No. 62166 did not constitute a collateral attack upon Order No. 58465. And, further, the Commission does have authority to delete a reservoir from purview of prior orders when supported by evidence showing a change in knowledge of conditions; and Order No. 62166 is supported by substantial evidence in this respect. See Cameron v. Corp. Comm., Okl., 414 P.2d 266.

In Carter Oil Co. v. State, 205 Okl. 374, 238 P.2d 300, at pages 303 and 304, we stated:

"* * * The application herein to change the units established by order No. 20585 solely upon the basis of facts existing at the time the order was entered and in evidence is but an effort to have said order reviewed and modified on account of error therein contrary to the provisions of 52 O.S.1941 § 111."

We conclude the unappealed from final Order No. 58465 in the present case can be modified only upon substantial evidence which shows a change in conditions, or a change in knowledge of conditions, arising since the last order.

Thus disposition of this case rests upon determination as to what is meant by change of conditions, or a change of

knowledge of conditions, of the area since the prior final order. Review of the evidence claimed to support a new order is required.

The factual issue for determination is whether the Upper Morrow Zone in the four sections (including Wiggins # 1) deleted from Order No. 58465 by Order No. 62166 is a separate source of supply from the Upper Morrow Zone found in the other wells (remaining under Order No. 58465) lying to the south and southwest.

The parties concede there was no new information derived from drilling which took place in the area subsequent to Order No. 58465. For this reason it is unnecessary to refer to cases involving additional drilling, subsequent to the last order, as supplying evidence to establish a change in condition or knowledge of change of condition.

Transcript of the hearing which produced Order No. 58465 disclosed the evidence was geological data derived from electric logs, drillstem tests, production and completion data on each of the wells. Applicant's experts introduced structural maps, cross-sections isopach maps and other data. From this evidence they concluded that by nature the Upper and Lower Morrow Zones were separate sources of supply, but due to the permitted commingling they were then one common source. The expert testimony extended the Upper Morrow as well as the Lower Morrow to include the well and area later sought to be deleted by Yingling (Order No. 62166). The testimony included evidence to show that field rules would provide a production schedule to protect the correlative rights in the area, which included a fair marketing quota to the various producers.

To support the order (No. 62166), Yingling argues that evidence as to pressure data, cumulative production curves, fluid analysis of both zones in the Wiggins # 1 and isopach maps on the Upper Morrow constituted sufficient evidence to support the showing of a change of the knowledge of conditions. And, further, the Commission did not have benefit of this evidence at the previous hearing, such facts having been obtained subsequent to entry of Order No. 58465.

In examining Yingling's evidence, part of the expert testimony was that Yingling-Wiggins and the Skelly-Wiggins, both dually completed offsets, were in the same Upper Morrow common source, which was a separate common source from the other wells to the south and southwest. The witness described the Upper Morrow in the area as lying structurally in pods, rather than a blanket type section as was the Lower Morrow that covered the whole area. This testimony, at most, indicates a different theory or interpretation of the facts as presented in support of Order No. 58465.

Expert R's testimony for Yingling appears to be the decisive basis of the final order entered by the Commission. It is significant in this connection that when this witness differed from two other experts produced by Yingling as to a separation of the common source in the Upper Morrow between the Skelly-Wiggins and the Yingling-Wiggins #1, the Yingling application was modified to exclude the Skelly-Wiggins. His opinion in reference to the separation in the Upper Morrow common source rested primarily upon analyses based on different pressures and fluids in the Upper and Lower Morrow.

In our determination we must consider what new or additional evidence was presented to show a change of knowledge, or change in the conditions, that can be ascertained between the date of previous order (58465) and the subsequent order (62166).

Yingling's evidence shows this comparative analysis could have been made and submitted at the prior hearing. The additional information introduced concerned data collected on the statistics based upon accumulation of production occurring subsequent to Order No. 58465, and prior to hearing on Order No. 62166. Yingling's expert testimony conceded the information

was available, and could have been ascertained and presented in support of Order No. 58465, but expressed the opinion additional statistics made the analysis more comprehensible.

We recognize that a comparative pressure analysis and fluid analysis may constitute substantial evidence in certain instances to support a modification upon a change of conditions. In the present case, however, both sides concede the well pressures varied from well to well in that field. The fluid analysis was shown only on the Upper and Lower Morrow of the Wiggins #1, and it was conceded the analysis (both as to fluid and pressure) could vary in wells which were producing from the same common source. We also note the inconsistency of expert R's testimony with that of Yingling's other experts.

Phillips cites 11 Okla.Law Rev. 125, an article entitled "Modification Order Pertaining to a Common Source of Supply" by Howard H. Harris which on pages 132 and 133 states in part:

"* * * Because substituted substantive rights actually vest in the property owners by the force of such orders, the Oklahoma Supreme Court has laid down the rule that a modifying order will be condemned as a prohibitive collateral attack unless a 'substantial change of condition' has intervened between the dates of the existing and the superseding orders. What constitutes a change of condition sufficient to satisfy the requirement? As a logical proposition, three kinds of change of condition are theoretically possible. The first may be designated as an internal change of condition. It is characterized by an actual change in the physical behavior of the reservoir occasioned by development and depletion. Such a change may or may not be predictable in the early stages of development. * * * The second kind may be called an external change of condition. In this instance, the physical behavior of the reservoir remains constant, but the information gained

through development or depletion experience demonstrates that the conclusions reached originally were incorrect. * * * An external change of condition is characterized by the fact that the animal was incorrectly described in the first instance—the dog was called a cat and the mistake was discovered later. That such a change of condition satisfies the legal requirement is supported by the first *Peppers* case. The third possible kind of change of condition defies tagging with an appropriate label. * * * In this case no actual change in the physical behavior of the reservoir is experienced, * * * Nevertheless, new scientific knowledge and technology may add new dimensions to the basic legal concepts of waste and correlative rights, or the statutes may be superseded by others which re-define these terms."

The review cites and quotes Application of Peppers Refining Co., 272 P.2d 416 (Okl.1954) wherein the court at page 424 said:

"* * * To hold that the Commission could never modify a well spacing pattern established by a previous order not appealed from, upon a showing of characteristics about a common source of supply, and the withdrawals therefrom, that were not known or anticipated at the time of the original order, would 'tie the hands' of the Commission and often prevent it from performing its statutory duties under the Oil and Gas Conservation Act. * * *"

Yingling also cites this case.

When we consider the production history available prior to Order No. 58465, in comparison with production history between entry of Order No. 58465 and entry of Order No. 62166, we conclude the factual data relied upon to supply proof of change in conditions, or change in knowledge of conditions, did not constitute substantial evidence to support Order No. 62166.

**602**

We were particularly impressed with expert R's testimony. He testified that there was at the time sufficient production history to supply proper basis for a better formula than that prescribed under the field rules.

We have reviewed the evidence and conclude the applicant failed to provide substantial evidence to show a change in conditions, or a change in knowledge of the conditions, upon which to base the Corporation Commission Order No. 62166.

Corporation Commission's Order No. 62166 is hereby vacated.

IRWIN, C. J., and DAVISON, WILLIAMS, JACKSON, HODGES, LAVENDER and McINERNEY, JJ., concur.