CITIES SERVICE OIL CO. v.
ANGLIN et al.

No. 33969.    Feb. 20, 1951.

*228 P. 2d 191.*

F. H. Bacon, Hayes McCoy, R. O. Mason, L. L. Corn, and Chas. T. Klein, Bartlesville, for appellant.

Floyd Green, Oklahoma City, Anglin, Stevenson & Huser, Holdenville, and Turner & Turner, Eufaula, for appellees.

LUTTRELL, V. C. J.  On April 26. 1948, Cities Service Oil Company, representing itself to be owner of oil and gas leases covering the greater portion of approximately three sections of land in Hughes county, filed an application with the Corporation Commission for the establishing of 160-acre drilling or spacing units for the area. The application was resisted by some 30 royalty owners and landowners, owning land or royalty within the area, who requested 40-acre spacing units instead of the 160-acre units sought by applicant. The application was tried before the trial examiner, and upon ascertaining that he had prepared a report recommending the establishment of 40-acre spacing units within the area, applicant dismissed the application and the Commission entered an order dismissing the case.

Shortly thereafter the land and royalty owners who had protested the application of plaintiff filed with the Com-

mission an application, docketed as cause No. 1853, for the establishing of 40-acre drilling or spacing units in the same area as that covered by the application of Cities Service. When this matter came on for hearing before the trial examiner, Cities Service appeared and protested the granting of the application, and requested instead that the Commission establish 160-acre spacing units. The trial examiner heard evidence introduced by the parties, including the record made at the hearing on the application previously filed by Cities Service, and filed a report with the Commission recommending the establishment of 40-acre spacing units within the described area. Cities Service filed exceptions to the report, and the Commission, after hearing argument by the parties, adopted the findings of the trial examiner, and made an order establishing 40-acre spacing units within the area. Cities Service appeals from this order.

Cities Service on appeal contends (a) that the findings of the Commission are not supported by substantial evidence; (b) that if it be assumed that the findings are supported by substantial evidence the order is void for the reason that it combines more than one common source of supply for the purpose of well spacing; (c) that the spacing unit established is so small that a lessee drilling a well on the unit cannot recover the cost of drilling and equipping such well, and therefore the order promotes waste and violates the correlative rights of the parties.

From the record it appears that, at the time the application of the land and royalty owners was heard by the trial examiner, Cities Service had drilled and completed three wells within the described area. One of these wells was in the northeast corner of the southeast quarter of the northwest quarter of section 12, township 9 north, range 10 east, another was at approximately the center of the southwest quarter of the same section, and the third was approximately in the center of the southeast quarter of the same section. All the wells so drilled produced gas from the formation known as the Booch Sand, found at a depth of between 2,300 and 2,400 feet. The sand in this area was some 36 inches thick, and the initial bottom hole pressure of the wells was approximately the same, being in the neighborhood of 1,000 to 1,100 pounds. Some two miles north of the described area was another Booch Sand pool from which gas was produced at approximately the same depth.

The applicants, in support of their application for 40-acre spacing, produced various witnesses, owners of royalty in the pool adjoining the described land on the north, and in other Booch Sand production, as well as the conservation officer from that district. These witnesses testified that a distinguishing or peculiar characteristic of the Booch Sand was that it was lenticular, and that there were shale breaks running through the sand which prevented the free migration of gas, so that one well would not adequately drain 160 acres, but would leave a considerable amount of gas unproduced. They testified that in view of this characteristic, peculiar to the Booch Sand wherever found, and especially because of its prevalence in the Booch Sand pool immediately north of the described area, the establishment of 40-acre spacing units would result in the ultimate recovery of gas which would not be recovered if only one well were drilled on 160 acres. They could not and did not testify that to their knowledge such condition did obtain in the area sought to be spaced, but based their opinion or conclusion that the sand in the described area did contain such shale breaks upon their knowledge of the condition of other Booch Sand pools.

The principal witnesses for Cities Service, a geologist and a petroleum engineer employed by it, testified that from their examination of cores taken from the three wells on the property, and the examination of the electric logs

taken in these wells, and the fact that the sand was found at approximately the same depth, was approximately the same thickness, and that the wells had approximately the same bottom hole pressure, it was their opinion that there were no shale breaks in the area, and that therefore the drilling of one well on 160 acres would sufficiently drain the 160 acres. They further testified that the probable recovery of gas from a well drilled in the described area would make the drilling of a well on each 40 acres thereof unprofitable, in that the gas recovery would not be sufficient to pay for the well. Their testimony was that the actual cost of drilling the three wells in the area was between $19,000 and $20,000 per well, while the estimated recovery from a well on a 40-acre tract at the prices then being paid in the field would only produce between $11,000 and $12,000.

A witness for the applicants, an oil producer and drilling contractor, testified that he drilled and equipped wells in the pool adjoining the area on the north for approximately $12,000, and that all the wells drilled in that pool were paying wells; that they were on 40-acre spacing, although the Commission had not made an order putting in effect 40-acre spacing in that area, and that in his judgment, considering the amounts of gas produced from the wells of Cities Service in the described area, wells could be drilled on 40-acre spacing profitably. All the witnesses, both for the applicants and Cities Service, admitted that the Booch Sand ordinarily was very spotted because of shale breaks which were contained in the formation, and one witness for applicants, the conservation officer for that area, testified that he had never known of an area of 160 acres underlaid by the Booch Sand in which shale breaks did not occur, and that in his opinion the drilling of a well offsetting any of the wells drilled upon the described area by Cities Service was just as likely to be a dry hole as a producer.

The Commission found that the Booch Sand underlying the described area was lenticular and contained shale breaks, which condition was likely to prevent the migration of gas in said sand in certain places, and that to drill a well on a unit larger than 40 acres might result in recoverable gas being left in the ground and thereby constitute waste; that the cost of drilling wells would probably average the sum of $15,000 per well; that the probable recovery of gas from said pool would be greater than that calculated by the witnesses for Cities Service, and that, taking all these facts into consideration, drilling units should be 40 acres each, each 160-acre tract to be divided into four drilling and spacing units according to government survey, and the well to be located in the center of each quarter quarter section.

In Pannell v. Farmers Union Co-op. Gin Ass'n, 192 Okla. 652, 138 P. 2d 817, we called attention to the constitutional provision, art. 9, section 20, providing that in appeals from the orders of the Corporation Commission, where constitutional questions were not urged, the review by the Supreme Court should not extend further than to determine whether the Commission had regularly pursued its authority, and whether its findings and conclusions were sustained by the law and by "substantial evidence". The definition of "substantial evidence" in that case was approved and followed in Chicago, R. I. & P. Ry. Co. v. Vogel, 195 Okla. 194, 156 P. 2d 620, and in Yellow Transit Co. v. State, 198 Okla. 229, 178 P. 2d 83. In Yellow Transit Co. v. State, supra, we said:

"The determination whether there is 'substantial evidence' to support an order made by Corporation Commission does not require that the evidence be weighed, but only that the evidence tending to support the order be considered to determine whether it implies a quality of proof which induces the conviction that the order was proper or furnishes a substantial basis of

facts from which the issue tendered could be reasonably resolved."

Measured by this rule we consider the evidence before the Commission in support of the application for 40-acre spacing in the instant case sufficiently substantial to require us to sustain the order. While it is true that the witnesses for the applicants did not testify as to the condition of the Booch Sand under the described area, they did testify to the conditions which obtained generally in the Booch Sand, and particularly in the area one and one-half or two miles north of the described area, and from their testimony it could be reasonably anticipated that such conditions also obtained in the area described in their application, since from their testimony it appears that wherever the Booch Sand as a gas producing formation had been encountered in the adjoining or surrounding areas in Hughes county, it had been found to be spotted, broken by strata of shale, so that production from one gas producing well drilled therein did not prove the entire area, but only proved that portion upon which the well was drilled. Under this evidence the Commission was justified in believing and finding that the same condition obtained in the area in question.

The contention that the order of the Commission combined more than one common source of supply is, in our judgment, without substantial merit. We do not understand that in order to be a common source of supply as defined in 52 O.S.A. §86.1, 52 O. S. Supp. 1947 §86.1, the gas producing sand through the entire area must be free from all faults or obstructions of any kind, so that a well drilled on one portion thereof would ultimately drain the entire common source of supply. This in essence appears to be the construction Cities Service would have us place upon that definition. In the instant case the testimony of the witnesses did not indicate nor did the Commission find that the shale breaks or lenticular formation of the sand under the described area would completely sever any portion of the tract from all remaining portions. The witnesses testified that due to such breaks or shale formations occurring in the sand the migration of gas from one portion of the 160-acre tract to a well drilled in the center thereof would, in their opinion, be impeded or obstructed, and the Commission found that such condition was likely to prevent the migration of gas in such sand in certain places.

In Re Lovell-Crescent Field, 198 Okla. 284, 178 P. 2d 876, the evidence showed that there was some obstruction or pinching out of the sand at the south end of the Lovell field, which was north of the Crescent field, but in that case we held that the evidence that the same type of oil and gas was found in both fields, and was Layton Sand production, was substantial evidence sufficient to sustain the order of the Commission holding that the two fields were one common source of supply.

The contention that the drilling or spacing unit established is so small that the cost of drilling a well thereon could not be recovered, and that therefore the order permits waste and violates the correlative rights of the parties by preventing the drilling of wells, and recovery of the gas, is likewise untenable. The evidence given by men of practical experience, who had had occasion to observe the production from the Booch Sand in other areas in the vicinity, and who were therefore acquainted with its potential possibilities as to amount of production, was taken by the Commission rather than the estimate of the Cities Service witnesses based upon the amount of production from its wells, the thickness of the sand, and the area drained by the wells. The finding of the Commission that the probable recovery of gas from the described area would be in excess of the amount ascertained by the Cities Service witnesses was, in our judgment, sufficiently sustained by substantial evidence.

Order sustained.

ARNOLD, C.J., and WELCH, CORN, DAVISON, JOHNSON, and O'NEAL, JJ., concur. HALLEY, J., dissents.