CRESLENN OIL CO. et al. v. CORPORATION COMMISSION et al.

No. 34938.    May 6, 1952.

*244 P. 2d 314.*

Robinson, Shipp, Robertson & Barnes, Oklahoma City, for plaintiffs in error.

O. B. Moody and R. V. Kennemer, Jr., Lindsay, and Floyd Green and Ferrill H. Rogers, Oklahoma City, for defendants in error.

O'NEAL, J. This is an appeal from an order of the Corporation Commission of the State of Oklahoma challenging the validity of Order No. 24052 entered on the 5th day of October, 1950. Prior to the entry of this order and under date of December 18, 1947, the Corporation Commission of Oklahoma issued its Order No. 20733 establishing 40-acre drilling and spacing units for production of oil and gas from the Deese Sand common source of supply underlying sections 3, 4, 9 & 10, township 4 north, range 3 west, Garvin county, Oklahoma, which provided that no more than one well be drilled on each 40-acre tract, approximately in the center thereof, but that if there should be existing surface obstructions that would interfere with such location, then without special permit by the commission the well might be located so as to avoid such surface obstructions, but, in no event, further than 150 feet from the center of each spacing unit.

On May 9, 1950, the Creslenn Oil Company and Elm Oil Company filed with the Corporation Commission their application for an order permitting them to drill a well at a point 295 feet east of the center of the southeast quarter of the southwest quarter of said section 9, alleging for grounds therefor that the well, if located in the center of said spacing unit, would have to be drilled in the former channel of the Washita river. A hearing was had on the application on the 31st day of May, 1950, and the commission entered its order in said cause which permitted and authorized the Creslenn and Elm oil companies to drill a well at a point approximately 295 feet east of the center of the southeast quarter of the southwest quarter of said section 9.

On June 2, 1950, J. M. Brown, the owner of the 40-acre tract lying directly east of the Creslenn and Elm oil companies' 40-acre tract, filed his application with the commission to reopen the application of the Creslenn and Elm oil companies and prayed that the order be vacated on the ground that J. M. Brown did not receive notice of the application for hearing before the commission; and that, in any event, the applicants would gain a geological or structural advantage if permitted to change their drilling location; and that such change, if permitted, would cause an unfair drainage in favor of the Creslenn and Elm Oil Companies and against J. M. Brown.

The commission entered an order vacating its order of May 31, 1950, and reset the cause for hearing on the 30th day of June, 1950. Upon the rehearing, evidence was introduced before a trial examiner, and, thereafter, on October 5, 1950, the commission entered its order authorizing the Creslenn and Elm oil companies to drill, complete and produce their well at a location 288 feet east and 102 feet north of the center of the southeast quarter of the southwest quarter of said section 9. An additional order was entered to the effect that if the Creslenn and Elm well became a producer that the production from the well should

be 90 per cent of the allowable for wells in the pool in which this well is located, or 90 per cent of the capacity of the well to produce, whichever is the lesser.

The Creslenn and Elm oil companies appeal from the order and assert that the Corporation Commission has no authority to set aside or modify a final order and to enter a new order affecting the correlative rights of litigants before the commission in the absence of a showing of fraud or change of condition.

J. M. Brown, the owner of the royalty rights under the southwest quarter of the southeast quarter, the adjoining 40-acre tract, asserts that the Corporation Commission had the power, authority and right to enter its Order No. 24052 and that said order is sustained by substantial evidence and is not arbitrary or unreasonable.

The Creslenn and Elm oil companies, in support of their assignment of error, call our attention to our recent decisions in Carter Oil Co. et al. v. State, 205 Okla. 374, 238 P. 2d 300, and Wood Oil Co. v. Corporation Commission, 205 Okla. 534, 239 P. 2d 1021. These cases do not support their contention. In the Carter case, the opinion discloses that the Corporation Commission had, pursuant to 52 O. S. 1951 §87.1, established well-spacing and drilling units. Thereafter the owner of a mineral interest on land within the unit filed an application with the commission pursuant to 52 O. S. 1951 §112, to repeal, amend, modify or supplement the previous order issued by the commission. We held that under section 112 the commission did not have the authority to modify or supplement its original order (§87.1) in the absence of a statutory notice of hearing thereon and in the absence of a substantial change in condition. We held that it would be an unreasonable application of the police power to permit the Corporation Commission to modify or supplement a previous final order without notice to all interested parties.

In the Wood case, we held that the Corporation Commission was without authority to entertain or grant an application to vacate, amend or modify a spacing and well drilling unit established by a former order of the commission, and which order had become final and not appealed from. Specifically, we held that the commission's orders made in pursuance of the authority granted by statute are not subject to a collateral attack.

As we have seen, the original drilling and spacing unit order specified that one well be drilled on each 40-acre tract in the center thereof, but, if there were surface obstructions that would interfere with such location, then without special permit by the commission such well might be located so as to avoid such surface obstructions, but not further than 150 feet from the center of the tract.

This order clearly shows that an operator can, to avoid natural surface obstructions and without leave of the commission, establish his drilling site 150 feet in any direction from the center of the 40-acre tract. It also clearly demonstrates that the commission, in a proper case, could assume jurisdiction and grant a permit to establish a well beyond the 150-foot tolerance.

It is urged that the commission was without authority to vacate its Order No. 20733, which it had entered on May 31, 1950, for the reason that the motion to vacate the same was a collateral attack upon a final order of the commission prohibited under 52 O. S. 1951 §111. We hold that this is not a collateral attack, but is a direct attack upon an order that had not become final and that it was within the discretion of the commission to vacate the same upon a showing that Brown did not have notice of the filing of the application or the order made thereunder.

It is significant to note that the owner of the working interest (The

Texas Company) operating the oil and gas lease upon the J. M. Brown 40-acre tract did not join Brown in opposing the application of the Creslenn and Elm oil companies to establish a well drilling site.

The evidence is without substantial dispute that the well on the Creslenn and Elm companies' tract, if drilled in the center thereof, would fall practically in the bed of the Washita river. The commission found:

"That the Washita River runs through said unit in a general north and south direction, and the location of the permitted well is west of the present channel of the Washita River, and would be in a former channel of said river which is underlain by quicksand and is in a low overflow bottom, and is inaccessible to the public highway, and would be unduly hazardous to drill a well at said location and expensive to build a road for the purpose of ingress and egress thereto."

Pursuant to this finding, the commission, in its Order No. 24052, authorized the Creslenn and Elm companies to drill, complete and produce a well 288 feet east and 102 feet north of the center of their 40-acre tract. The order also provides:

"That the allowable production from said well shall be 90% of the allowable for wells in the pool in which this well is located or 90% of the capacity of the well to produce, * * *"

J. M. Brown and the commission contend that this portion of the order should be sustained on the ground that there is substantial evidence to support the same and that the order is neither arbitrary nor unreasonable.

This contention requires an examination of the evidence in support of the order. The extent of our review of the evidence is limited under art. 9, §20, of the Constitution of the State, which, insofar as here applicable, provides:

" * * * In all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence. * * *"

Under our limited power of review, we are not authorized to make a comparison of evidence introduced by the respective parties before the commission, nor are we authorized to weigh the evidence to see whether the order of the commission is in accord with the weight of the evidence.

As we construe the evidence in its entirety, we are unable to find substantial evidence justifying the necessary finding of the commission that the drilling of the Creslenn and Elm companies' well at the point designated in the order would result in drainage of oil from the J. M. Brown tract.

Earl Clay, an oil operator in this field, familiar with the terrain in the Washita Valley river and the location of the well in question, was asked if there was any structural or geological advantage in the relocation of the well, and his reply was:

"No, sir. I don't think in the Pennsylvanian zone down there that it would effect any drainage on anybody's property because I think it is generally agreed in the geological fraternity that there are hard spots in that zone and there is no way of determining beforehand, – we might get on a worse location than we are moving on."

And in response the trial examiner propounded the following inquiry:

"Well, do you feel that the correlative rights of those people will be affected by this move or change of location? A. I don't believe they will be affected at all."

V. A. Machulis, a civil engineer and a graduate of the Armour School of Technology, holding a bachelor of science degree in civil engineering and presently employed by The Texas Company, the operator of the J. M. Brown 40-acre tract, was asked if there are

any obstructions near the center of the 40-acre tract in question that would prevent the drilling of the well at its normal location.

"A. Well, I have never been across the river where the normal location should be. However, this well is 30 feet from the river and I would say is in no better condition than the normal location would be."

G. R. Bates, a petroleum engineer presently employed by The Texas Company, was asked the following question:

"Well, based on your information, the productiveness of the sand in the Brown well and of the wells you have described northwest, can you say whether or not you would expect geological advantages to be obtained by the Creslenn Oil Company in drilling their well East of the normal location? A. Well, from all indications so far, I would say East of the river would be a good shot because you have that good development East of the river; and West there isn't too much activity. It's pretty hard to say, you would just have to drill a well to find out in that particular area.

"Q. Now, there is nothing that I can gather from your testimony to indicate that there is any geological advantages here other than the fact that present proven production is to the East, is that right? A. That's right."

The witness was asked with reference to drainage the specific question:

"I believe that you have compiled the mathematical figures which would indicate the amount of drainage that a producing well from this sand in the present location would drain from the adjoining 40-acres on the west of Mr. Brown's, is that correct? A. No, sir. When compiling a drainage figure like that, the accumulated production enters into it and we really haven't got the accumulated production from which to establish the figures."

Kenneth Ellison, a geolgist and independent oil operator, was asked:

"Q. Now, are you familiar with this drilling unit known and described as the SE/4 of the SW/4 of Section 9, 4 North, 3 West, in the New Hope area? A. I am familiar with it from a geological standpoint and subsurface standpoint; I am not familiar with the facts of the surface conditions.

"Q. Now, as you gather from the testimony here, the question before the Commission is the geological advantage, if any, to be gained by moving the well location approximately 300 feet in a Northeasterly direction - now, I wish you would give us your views on that, please, sir. A. Well, in my opinion, from a study of sand thicknesses and potentials of the wells surrounding this unit, I don't believe that two or three hundred feet is going to make sufficient difference as to the difference between a dry hole and an oil well, or between a small oil well and a big oil well. As you go Eastward, you get a few feet higher structure but that has no bearing on the productivity of the Gibson sand. The primary factor is the sand conditions, the quality of the sand and the quantity of the sand; and as the engineer for the other company testified, the sand is irregular. It comes and goes, thickens and thins and that's the kind of a sand that is not conducive to wide drainage. Therefore, a producing well on this unit, in my opinion, will never be able to drain any oil out from under the Brown 40-acre unit immediately to the East, only on possibly one condition - that would be in the event that this location from the unit under discussion would be many times better in the ability to produce, and many times more feet of sand and many times better sand, and without proration - then in that event, Creslenn might have some advantage over the Brown unit. But under the proration with the allowable down there, which at the present time, I believe, is 85 barrels per well per day, there is not any way that I can conceive that the producing well on this unit, if it was a producing well can ever get one barrel of oil out from under the Brown unit.

"Q. But we do know that we have good production on the Brown well to the East and the one just as close to it as possible? A. I don't think that's right. No, sir. I am sure they can't get any of the Brown oil in the location

where they are right now, they're more than 388 feet from the Brown property and I'm positive they will get a smaller well than the Brown well and that being true, I don't know how in the world they'll get a barrel of oil out from under the Brown tract."

Charles E. Dimmett, a graduate of the Columbia Engineering School and a producer of oil in the Garvin county area, was asked the following question:

"Now, there has been a great deal of testimony as to the possible geological or structural advantages of drilling on one spot in this '40' as opposed to some other spot, have you anything apropos on that subject? A. Well, from the information that was presented to us and on consideration that we took the farm-out basis, we had no reason to believe but that the whole '40' was productive or reasonably so. Any one spot on that acreage would have been as well geologically as the other one. We did not take into consideration whatsoever, geologically, in moving or requesting the special permit from the Commission to move the location. It was purely on a topographical basis that we moved that location."

This evidence does not sustain the fact that the Creslenn and Elm companies' well will drain any oil from the Brown land. Not a single statement is found in the record that one location on the Creslenn and Elm companies' 40-acre tract is more liable to produce than any other location. The fact that the well was located on the east bank of the Washita river, rather than on the west bank, or river bottom, does not establish that one location is geologically better than the other. In ancient times, some geologists subscribed to the so-called "creekology" theory, that is, that a substructure could be defined by a river bank. No one so contends here. Neither is there a scintilla of evidence as to whether a producing well would drain 10 per cent, or a lesser or a greater percentage of oil from the Brown tract. No substantial evidence gives us any information

upon which to base a finding on that issue.

For this reason, we hold that the order reducing the allowable should be reversed.

HALLEY, V. C. J., and WELCH, CORN, DAVISON, and JOHNSON, JJ., concur.