In the Matter of the Application of CHAMPLIN REFINING COMPANY and Powel Briscoe for the Establishment of Quarter Section Layton Sand Drilling and Spacing Units for the Southwest Quarter (SW/4) of Section 1; South Half (S/2) of Section 2; Southeast Quarter (SE/4) of Section 3; East Half (E/2) of Section 10; all of Section 11 and West Half (W/2) of Section 12, Township 15 North, Range 2 West, Logan County, Oklahoma.

No. 36949.

Supreme Court of Oklahoma.

April 17, 1956.

Barth P. Walker, Garrett & Garrett, Oklahoma City, Nathan Scarritt, Cecil E. Munn, Enid, for plaintiffs in error.

Merle G. Smith, Guthrie, Ames, Daugherty, Bynum & Black, Oklahoma City, Floyd Green, Conservation Atty., Ferrill Rogers, Asst. Conservation Atty., Oklahoma City, for defendants in error.

CORN, Justice.

Champlin Refining Company, with other interested parties, all of whom shall be referred to as "Champlin", applied to the Corporation Commission for an order establishing 160 acre drilling and spacing units for a gas and gas condensate field in Logan County, Oklahoma.

This field, discovered by completion of a producing well designated Poteet No. 1, was determined to be from a common source of supply in the Layton Sand, there found at a depth of 4584–5597 feet. The area included in the application covered 1920 acres (Secs. 1, 2, 3, 10, 11, 12, Township 15 N., Range 2 W., Logan County) and was defined by dry holes drilled prior to the discovery well. Numerous owners of mineral interests within the included area appeared and protested Champlin's application.

The expert witnesses, for both Champlin and protestants, were in complete agreement relative to the geology of the area. The evidence was that in this area the Layton Sand is erratic, not of uniform deposition, and is subject to pinch-outs; in some places the sand is tight and nonproductive, and in other places might be entirely absent. The discovery well showed 13 feet of Layton Sand, of which 8 feet was considered to be effective pay sand.

Champlin's evidence was that the Poteet well alone would drain the entire field if given sufficient time; 160 acre spacing would adequately, efficiently and economically recover the gas and liquids from each such unit in the reservoir, and under such plan 95 percent of the minerals ultimately would be recovered. Champlin's geologist also testified that, due to the erratic nature of the reservoir constituting the common source of supply, proper spacing in this field "should represent the smallest economic unit." However, it was his opinion that 160 acre spacing would provide this. The evidence also showed that, under this spacing pattern, there would be two inside locations and ten outside locations in the area. The two inside locations most probably would be productive and the outside locations might be nonproductive. And, in drilling additional wells it would be prudent to stay as close as possible to the producing well.

The petroleum engineer who appeared in behalf of protestants testified that 160 acre spacing would establish an impractical development pattern; a reservoir of this type could not be developed fairly with half mile stepouts from well to well, this being a long stepout and which would have the effect of making every well a wildcat; one well to 80 acres should be the maximum density for the area; a person owning 80 productive acres should be entitled to one well in the reservoir; erratic conditions of the reservoir are such that to limit a party's chances to drill his productive well might result in causing him to forfeit his entire stake in the common source of supply. This witness further testified that he would recommend 40 acre spacing, with additional 40 acres attributable to each unit, in order to give a choice of two locations, and still retain 80 acre well density.

The testimony of the parties' petroleum engineers was conflicting as respected the

economies of development. Champlin's engineer testified that under 80 acre spacing an operator would have total recovery of $55,000 against total costs of $46,000, leaving $9000 working profit, which would provide 20 percent profit to the operator. The witness also testified that under 160 acre spacing the ultimate recovery would amount to $110,000, thus representing a profit to investment ratio of 1.41 to 1. The estimate was that it would take 15 years for a well on 160 acres to produce products having this value. This witness based his calculation upon factors evolved from certain scientific information. However, the witness had not had the benefit of the actual production figures on the discovery well.

Protestants' witness had obtained the production figures on this well. These showed that over a 41 day period Champlin had produced and sold approximately 66 million cubic feet of gas, of an estimated 10–15 million cubic feet production capacity per day, together with 154 barrels of condensate. His calculations, except for the actual production figures and the fact that he included an additional 2 feet of effective pay sand, took into consideration and were based upon the same scientific information as that used by Champlin's engineer. This witness testified that, based upon a pattern of 80 acre well density, an operator would recover $130,000 gross, $110,000 net to the working interest, against an investment of $55,000, including operating costs, which would represent a profit of 100 per cent to the operator. He further testified that under a plan of 40 acre spacing each well would be simply a break-even proposition; that the minimum well density should be 80 acres; that he recommended 40 acre spacing with attributable acreage permitted up to two locations or 80 acres; this would provide the most flexible pattern and give the operator an opportunity to use his best geologic and engineering reasoning in locating wells, and yet would not jeopardize the economics of the entire reservoir.

Upon consideration of the evidence presented to the trial examiner the Commission made findings which substantially reflected the above recited facts. The Com- mission ordered establishment of 80 acre drilling and spacing units from the Layton Sand common source of supply underlying the described area; divided each 80 acres into two drilling and spacing units by a north and south line through the center of each quarter section; fixed well locations in the center of northeast and southwest 40 acres of each quarter section, permitting 150 feet tolerance to avoid surface obstruction; made exception as to Poteet No. 1 well, but provided same should be the only well located in that particular unit; and provided for further adjudication of other leasehold interests within any unit where parties might be unable to agree upon a plan for development of the unit.

Champlin has appealed from the Commission's order. No controversy exists over the finding that the Layton Sand constituted a common source of supply. However, it is urged that the Commission had to determine whether " * * * to prevent or to assist in preventing waste or to protect or to assist in protecting correlative rights" drilling and spacing units should be established. Champlin's appeal is predicated upon the inquiry as to whether the Commission's findings and order are sustained by sufficient evidence.

Champlin's attack upon the order, presented by a well reasoned, logical brief, may be summarized in the following manner; the statutory authority under which the Commission may act to create drilling and spacing units can be exercised only to prevent waste or to protect correlative rights. "Waste" is defined by statute, 52 O.S.1951 § 86.3, as "inefficient or wasteful utilization" of gas from a common source of supply; production in such quantities or in such manner as to unreasonably reduce reservoir pressure or diminish supply, or waste incident to production, etc. The record contains no evidence to sustain the finding and order that establishment of 80 acre drilling and spacing units in this field will prevent waste or protect correlative rights by permissive drilling of twice the number of wells Champlin contends is the minimum economic unit. Since the record contains no iota of evidence to support the order establishing 80 acre units in an in-

flexible well pattern, it is apparent such order represented a compromise solution. Thus, under the rule announced in Creslenn Oil Co. v. Corporation Commission, 206 Okl. 428, 244 P.2d 314, the order must be reversed.

■■■■ Prior decisions of this court have delineated the guide posts to be used in measuring the propriety of the Commission's orders in these cases. Conflicting questions of fact are to be resolved by the Commission. Application of R. Olsen Oil Co., 205 Okl. 498, 239 P.2d 415. Where the order entered is supported by competent evidence it must be sustained. Superior Oil Co. v. Oklahoma Corporation Commission, 206 Okl. 213, 242 P.2d 454. To ascertain whether an order is sustained by substantial evidence this court will not weigh the evidence, but will consider the evidence (relied upon to support the order) to determine whether it induces the conviction the order was proper, or furnished a substantial basis of facts from which the issue presented reasonably could be resolved. Pannell v. Farmers Union Co-op Gin Ass'n, 192 Okl. 652, 138 P.2d 817; Cities Service Oil Co. v. Anglin, 204 Okl. 171, 228 P.2d 191. And, in deciding between conservation of natural resources and the protection of correlative rights, the latter is secondary and must yield to reasonable exercise of the former. Grison Oil Corp. v. Corporation Commission, 186 Okl. 548, 99 P.2d 134; Denver Producing & Refining Co. v. State, 199 Okl. 171, 184 P.2d 961.

■■■ With these principles in mind we must consider whether the order appealed from is supported by evidence which afforded a substantial basis of facts therefor, or whether such order only represented a compromise between the two extremes of the evidence. It may be conceded, as pointed out by Champlin, that the order appealed from did not recite with particularity the precise ground upon which same was based. True, the order did not specify that 80 acre drilling and spacing units were established to prevent waste by any one of the causes mentioned in the statute, supra. Neither was the order founded explicitly upon prevention of waste or protection of correlative rights. We are unable, however, to accept Champlin's conclusion, based upon its own conception of the matter, that there is a total lack of any evidence to support the order.

The Commission's Finding No. 9 was (in part) as follows:

"9. That based on all of the testimony introduced in this case, it appears that this is an erratic sand pool, likely of small area extent, and that to require wells to be drilled on a wide pattern would likely prevent drilling of wells where production could be had and require the drilling of wells at locations where oil and gas could not be produced; that it appears from the evidence that at least some reasonable profit can be made by drilling wells on an 80 acre pattern, and that it is more likely that the pool will be developed by drilling on this pattern, and that a greater ultimate recovery of gas and gas condensate can be recovered, and recovered economically, and the Commission should enter an order establishing 80 acre drilling and spacing units for the production of natural gas and natural gas condensate from the Layton Sand underlying the above described area; * * *"

The evidence summarized heretofore, provided a substantial basis for finding that the spacing order sought by Champlin would prevent drilling of wells where production could be found, while requiring other wells on locations where there probably could be no production. But, complaint is made that apparently the order primarily seeks prevention of economic waste; and, if such is true, the Commission had no basis for finding that a greater ultimate recovery would be had economically when, according to the evidence, 80 acre units would permit only 90 percent ultimate recovery as opposed to 95 percent thought to be recoverable under 160 acre drilling and spacing units.

The apparent difference of opinion between expert witnesses in respect to ultimate recovery, does not provide a sound basis for Champlin's assertion. Such argument ignores the fact that, by any spacing otherwise than on 80 acres, the rights of

various owners within the area most probably would be adversely affected, if not lost entirely. In Application of Peppers Refining Co., Okl., 272 P.2d 416, at page 424 a similar argument was answered most precisely in the following manner:

"In our opinion it is more important to secure to each lessor, lessee, and owner of mineral rights in a field, his ratable share of the production therefrom and to prevent underground waste, than it is to secure to some, the maximum profits from drilling and producing operations. * * *"

Neither do we consider as persuasive the argument that in view of the evidence, half the wells allowed under this order are "unnecessary" wells, and violative of the principles of conservation. In final analysis the result of this argument simply is that an operator, who determines that it may be possible to drain an area by drilling only one well (as was testified herein), can urge that any further wells are "unnecessary". We do not believe an "unnecessary" well should be defined as a well an operator prefers not to drill because of the possibility of eventual exhaustion of a proven area by one, or a few wells, without consideration or recognition of the rights of others in the area.

Champlin further contends the order herein reviewed represented a compromise between the two extremes of testimony, and must be vacated under the authority of Creslenn Oil Co. v. Corporation Commission, supra. We see no substantial merit in this argument. Protestants' expert witness stated that 80 acres was the "practical minimum" for well density. He further testified the most desirable pattern would be 40 acre spacing with 40 acres additional to be attributed to each well location, in this manner providing a flexible well pattern and giving the operator opportunity to cope with the erratic nature of the formation by permitting a choice of well locations. Since the maximum well density was limited to 80 acres we perceive no real difference between evidence explicitly recommending 80 acre drilling and spacing units, and evidence to the effect 80 acres should be included in each well location. The

practical effect is the same, except for the flexibility in well locations. The Commission undoubtedly recognized this fact, and, the order must be held to have been entered under evidence which furnished "'a substantial basis of facts from which the issue tendered could be reasonably resolved.'" Cities Service Oil Co. v. Anglin, supra [204 Okl. 171, 228 P.2d 193.]

Affirmed.

JOHNSON, C. J., WILLIAMS, V. C. J., and DAVISON, HALLEY, BLACKBIRD, JACKSON and HUNT, JJ., concur.