Everett CREWS and Helen Crews,
Plaintiffs in Error,

v.

·CHAMPLIN OIL & REFINING COMPANY
and the Corporation Commission of the
State of Oklahoma, Defendants in Error.

No. 41245.

Supreme Court of Oklahoma.

April 12, 1966.

Otjen, Carter, Huddleston & Otjen, by
Charles G. Huddleston, Enid, for plaintiffs
in error.

Nathan Scarritt, Enid, T. Murray Robin-
son, Oklahoma City, for Champlin Petro-
leum Co., defendant in error.

Ferrill H. Rogers, Oklahoma City, for
Corporation Commission of Oklahoma, de-
fendant in error.

BLACKBIRD, Justice.

This is an appeal from an order of the
Corporation Commission affecting a portion
of the Southwest Flynn Oil Field in Gar-
field County, Oklahoma.

The proceedings in the Corporation Commission, usually hereinafter referred to merely as the "Commission", were instituted by the filing of an "Application" by the defendant in error, Champlin Oil & Refining Company, hereinafter referred to merely as "Champlin" or "Applicant", in October, 1963. Said applicant had recently completed a well producing from the Oswego (Limestone) formation in the center of that part of the above named field geographically described as the Southeast Quarter of the Southwest Quarter of Section 6, Township 20 North, Range 5 West, called the Louise "B" Moore No. 1, but designated as the "Champlin-Moore" well on the plat which hereinafter appears in this opinion.

At the time this Moore well was completed, the Southwest Flynn Field had apparently been divided, under a previous order of the Commission, into 80-acre well spacing and/or drilling units for exploration of the Oswego formation, as a common source of supply. Under the drilling pattern, apparently established by said order, a geographical quarter section of land was divided into two such units, composed respectively of its east half, or 80 acres, and its west half, or 80 acres, with the permitted well for the west unit being located on its northern 40 acres, and the permitted location of the well for the eastern 80 acres of each quarter section, being on its southern 40 acres. Said pattern is indicated by the spots denoting the locations of the Sunray-Crews and the Sunray-Moravec wells, in the North Half of Section 7, Township 20 North, Range 5 East, as depicted on the plat below.

| SW/4 6–20–5 | SE/4 6–20–5 |
|---|---|
| | |
| Shell-Stutz | |
| * | |
| 180% | |
| Champlin-Moore | Magness-Anderson |
| * | * |
| 180% | 180% |
| NW/4 7–20–5 | NE/4 7–20–5 |
| * SunRay | * SunRay - Moravec |
| 100% Crews #2 | 100% #1 |
| 180% | |
| * | |
| Shell-Brooks | |
| SunRay * | SunRay-Moravec * |
| Crews #1 100% | #2 100% |

The purpose of the Application Champlin filed in the Commission was to obtain an order from it, the effect of which would be to make of the Southwest Quarter of Section 6, supra, an exception to the above described drilling pattern and/or well spacing order, by consolidating both of said quarter section's 80-acre tracts into one 160-acre drilling and/or spacing unit, and fixing the allowable of the Moore well, as said unit's producer, at not less than 180% of the allowable of each of the other wells in the Field.

Champlin's application was unsuccessfully opposed by plaintiffs in error, hereinafter referred to as the "Crews" or

"Protestants", who are the lessors of, and the owners of the minerals under, the Northwest Quarter of section 7, supra. They took the position that the increased allowable sought for the Moore well would enable it to drain oil from the Oswego formation, or same common source of supply, under their land to the south of it, that otherwise would be produced by their Sunray-Crews wells.

At the hearing before the Commission, the applicant introduced in evidence, as "Exhibit 6", a plat indicating that all of the wells in the subject Field encountered the Oswego formation at depths of less than 5,000 feet below the surface, and the evidence established, among other things, that the Southwest Quarter of Section 6, supra, is situated at the northern edge of said common source of supply. At the close of the hearing, the Commission entered its Order No. 54496, in which it found, among other things in substance, that the owners of the minerals under the Southwest Quarter of Section 6, supra, had agreed in writing that the Moore well would effect adequate development of the Oswego formation underlying it, and no other well was needed thereon. The Commission further found that if two wells were drilled on said quarter section, they would both be productive and entitled to produce their full allowable, but that the off setting quarter sections would suffer less drainage from the Moore well's producing 1.8 times "the per well field allowable" than if another well was drilled and produced on the same lease with it; that granting said well said increased allowable would not affect the correlative rights of the mineral owners in any adjacent quarter section, and particularly those in the Northwest Quarter of Section 7, supra; that applicant's entire quarter section is underlain with recoverable Oswego hydro-carbons and its well will efficiently and effectively drain not less than said quarter section of such hydro-carbons. After unsuccessful efforts to reopen the proceedings for the purpose of introducing new evidence, the protestants filed their objections to the above described order and perfected the present appeal therefrom.

 Under the first proposition protestants urge, in substance, that the effect of the provisions of the Order appealed from is to make one large 160-acre drilling and well spacing unit out of the Southwest Quarter of Section 6, supra. They charge that the unit thus established is larger than those the Commission may establish under Tit. 52 O.S.1961, sec. 87.1(c). One of the provisions of the cited statute is as follows:

"* * *

"The commission shall not establish well spacing units of more than forty (40) acres in size covering common sources of supply of oil the top of which lies less than 5,000 feet below the surface as determined by the original or discovery well in said common source of supply.

"* * *."

The applicant's brief does not directly answer this argument. It merely states that the Commission "has issued literally hundreds of orders granting wells increased allowables where the well development is of a lesser density and on greater acreage * * *"; and cites Kingwood Oil Co. v. Corporation Commission, Okl., 396 P.2d 1008 as decisive of all the issues in this case. The cited case does not mention any statutory limitation on the size of well spacing units, but we think there is no merit to protestant's argument. Section 87.1, supra, as amended by Chapter 121 S.L.1963, pages 158 and 159, is divided into sub-sections (a) to (d), both inclusive. The provisions of these subsections, including subsection (c), deal generally with proceedings for the establishment of, and, well spacing units generally, or in a given area, except the following language of subsection (b):

"* * *, with such exception as may be reasonably necessary where it is shown, upon application, notice and hearing in conformity with the procedural requirements of Sections 84 to 135, inclusive, Title 52, Oklahoma Statutes, 1951, and the Commission finds that any such

spacing unit is located on the edge of a pool and adjacent to a producing unit, or for some other reason that to require the drilling of a well at the prescribed location on such spacing unit would be inequitable or unreasonable. Whenever such an exception is granted, the Commission shall adjust the allowable production for said spacing unit and take such other action as may be necessary to protect the rights of interested parties."

The hereinbefore quoted provision of subparagraph (c) supra, limiting the size of spacing units to 40 acres applies to the establishment of well spacing units in an area generally, but not to an exception such as is referred to in the last quoted sub-paragraph (b). It would be illogical, and create an anomalous situation, if the size prescribed by statute for well spacing units generally, or as a general rule, was also made binding on the Commission in creating an exception to that rule. This would not only be inconsistent with the commonly accepted meaning of the word "exception", but it would unduly and unreasonably tie the Commission's hands in performing its duties, under our oil and gas conservation statutes, of protecting correlative rights and preventing waste.

Under their Propositions II and III, the protestants advance arguments in no material respect different from those advanced by Kingwood Oil Company under its second proposition in Kingwood v. Corporation Comm., supra. Of that argument, we there said:

"* * * As is evident, this argument is based upon the assumption that the order under review would authorize an inequitable or unfair taking by Cleary. This assumption is in turn based upon the assumption that our statutes require proration of oil to be solely on a 'per well' basis among the wells producing from a common source of supply, without regard to the number of wells being operated by any given producer, or any other factor. In support of this argument, Kingwood

cites 52 O.S.1961, § 274, and Wilcox Oil and Gas Co. v. State, 162 Okl. 89, 19 P. 2d 347, 86 A.L.R. 421.
"* * *."

After further discussing Kingwood's argument and the statute and case cited, as applied to the facts of that case, we there said:

"This argument would be persuasive if our statutes required the proration of oil to be on a 'per well' basis with no other factors considered, but as we have seen, this is not the case. The Commission's statutory authority to 'adjust the allowable production' for a spacing unit is clear. We find similar provision in the Commission's own rules.

\* \* \* \* \* \*

"The order under review does not violate Rule 303.1(c)." In view of what we said in the above quoted case, we find no merit in protestants' arguments under their Propositions II and III.

Under their Proposition IV, protestants argue that the order appealed from deprives them of their property without due process of law in contravention of the 14th Amendment of the U. S. Constitution and Art. II, sec. 7 of the Oklahoma Constitution. This argument is based on the theory that protestants have the claimed right that each of the two wells on their land—the Sunray-Crews No. 1 and 2 wells—have the same permitted, or allowable, production, as the applicant's Champlin-Moore well on the 160 acres north of it in Section 6, supra. Protestants' argument is based on the fundamental assumption and/or representation that permitting said Moore well a larger allowable than the respective allowables of the two Crews wells will deprive protestants of oil rightfully belonging to them—in other words, that it will drain oil out from under their land. To ascertain whether or not this claim is borne out by the evidence, and whether or not the Commission's determination to the contrary is supported by substantial evidence—as is denied in protestants' Proposition V—a brief discussion of some of the testimony elicited at the

hearing before the Commission is in order. Both the applicant and protestants introduced expert testimony, but the most pertinent part of this was elicited from appellant's petroleum engineer, Mr. Bartgis, and protestants' petroleum consultant, Mr. Crews.

Mr. Bartgis testified, among other things, that the Moore well, which had a capacity to flow at the rate of 300 barrels of oil per day, would effectively drain the entire Southwest Quarter of Section 6, though another well located in the Northwest Quarter of that quarter section (and conforming to the drilling pattern for the field) would also be a commercial producer. He further testified, however, that a dry hole had been drilled northwest of that quarter section, and that an additional well on it would cost approximately $60,000.00, and be an unnecessary expense, as it would enable the recovery of no substantial amount more of oil from the 160 acres, than the Champlin-Moore would eventually recover. In connection with his testimony that one well penetrating the Oswego formation in this locality would drain an entire 160 acres, Bartgis admitted that the production of such a well would not drain all of its production from the quarter section's undrilled, or northern, portion, but that such drainage *could* come from any direction, including the south. He also conceded that oil in that formation would probably migrate under the surface boundary between the applicant's and the protestants' property. He also testified that the more rapidly the Moore well is produced, the greater its drain from the surrounding reservoir, or common source of supply, and that this "transport" of oil would be more rapid into a well with a 180% allowable than into one with a 100% allowable. He also testified, in substance, that permeability is not the only factor in a well's drilling pattern, but that pressures in the reservoir are factors also. He expressed an opinion to the effect that the pressure in the Oswego formation under the Crews land could be low enough, from the producing of 2 wells thereon, as compared with the pressure in

that formation under the applicant's lease, that oil from the latter would drain south toward the 2 Crews wells. In this connection, he further testified that the "substantial amount" of the Moore well's production should come from the area of higher pressure, north of it, and expressed the opinion that if given an allowable of 180%, the Moore well should not recover more than its 160-acre tract's "fair share" of the reservoir's oil contents.

The testimony elicited from protestants expert, Mr. Crews, contradicted the above described testimony of Mr. Bartgis, but he admitted under questioning of the Vice-Chairman of the Commission that, to his knowledge, there was no "great difference" in the respective pressures of the Moore well and the Crews wells, and further testified that he did "not have the precise data on the pressure draw-down."

■ This brings us to the pivotal question in this case, which is: Is the appealed from order of the Commission supported by substantial evidence? If it is, then, under the limited power of review granted this court in such appeals, said order cannot be disturbed. As said in Sohio Petroleum Co. v. Parker, Okl., 319 P.2d 305, 309:

"* * * under our limited power of review, we are not authorized to make a comparison of evidence introduced by the respective parties before the Commission nor are we authorized to weigh the evidence to see whether the order of the Commission is in accord with the weight of the evidence. Creslenn Oil Co. v. Corporation Commission, supra [206 Okl. 428, 244 P.2d 314]. * * *"

Protestants' brief says that "Even a cursory perusal of the evidence in this case will reflect that the order is not supported by substantial evidence protecting" their correlative rights. They also say: "A careful reading of the evidence in this case will reflect that the only justification for the entry of this order is for the eliminating of 'economic waste'." Neither of these statements is supported by any demonstration of their factual correctness; and, from our

careful review of the entire record, we cannot agree with him. As we have shown, both the position of the applicant, and the finding of the Commission, to the effect that giving the Champlin-Moore well an allowable 1.8 times as large as the Southwest Flynn Field's regular well allowable would not adversely affect correlative rights, or drain more than its least's fair share of the Oswego formation's oil, were supported by the testimony of an expert witness. Neither the qualifications of this witness, nor the one who testified for protestants as experts on the matters about which they testified, has been challenged. While the evidence of neither contained any figures on bottom hole pressures, or pressures anywhere in the reservoir, common source of supply, or pool involved, and it lacked many of the factual details often produced by reservoir, or petroleum, engineers in similar cases, it may be that appropriate tests to secure this data may not yet have been conducted. While such data is usually desirable to help establish claimed facts concerning such matters as the drainage patterns of wells in a particular reservoir, and the extent of counter-drainage between offset wells, we cannot say that the statements and expressions of opinion, by the applicant's witness, do not constitute "substantial evidence"; and, as seen by what was said in the Sohio case, supra, we cannot weight it against that of the protestants' expert, even though the latter might seem to some more convincing. Therefore, we can only say the same thing of the subject order that was said of the order involved there, namely: " * * * we cannot say that the order was improperly entered or that it did not protect the correlative rights of the interested parties or that it was arbitrary or unreasonable."

As we have found no cause for reversal in any of the arguments presented against the order appealed from, it is hereby affirmed.

HALLEY, C. J., JACKSON, V. C. J., and DAVISON, WILLIAMS, IRWIN, BERRY and LAVENDER, JJ., concur.