SINCLAIR OIL & GAS COMPANY et al.,
Plaintiffs in Error,

v.

CORPORATION COMMISSION of Oklahoma, Defendant in Error (two cases).

PAN AMERICAN PETROLEUM CORPORATION, Plaintiff in Error,

v.

CORPORATION COMMISSION of Oklahoma, Defendant in Error.

Nos. 39667–39669.

Supreme Court of Oklahoma.

Feb. 5, 1963.

A. A. Davidson, and James H. McGowan, Tulsa, for Sinclair Oil & Gas Co.

Howard H. Harris, William J. Legg, Tulsa, for The Ohio Oil Co.

George H. Bowen, William C. Phelps, John O. Dean, and O. L. Peck, Jr., Tulsa, for Sun Oil Co.

M. Darwin Kirk, John F. Curran, and Wm. R. Loar, Tulsa, for Sunray Mid-Continent Oil Co.

Lupardus, Holliman & Huffman, by Robert A. Huffman, Tulsa, for Schermerhorn Oil Corp. and Kenwood Oil Co.

James B. Diggs, Tulsa, Edwin S. Hurst, Houston, Tex., and Comet C. Johns, Tulsa, for Gulf Oil Corp.

H. B. Watson, Jr., Tulsa, for Union Oil Co. of Calif.

Vinson, Elkins, Weems & Searls, by C. E. Bryson, Houston, Tex., W. M. Allison, Denver, Colo., and Lyle V. Smith, Oklahoma City, for The Pure Oil Company.

Norton Standeven, and T. Murray Robinson, Oklahoma City, for Pan American Petroleum Corp., plaintiff in error.

Ferrill Rogers, John Buckingham, and L. D. Hoyt, and Mac Q. Williamson, Atty. Gen., for Corporation Commission, defendant in error.

Charles L. Orr, Oklahoma City, amicus curiae.

BLACKBIRD, Chief Justice.

These three appeals, consolidated for the purpose of briefing and decision, are from orders the Corporation Commission (hereinafter referred to merely as the "Commission") entered in its consolidated causes CD13834 and CD14026, respectively.

Cause CD13834 was instituted in 1960 upon the filing, by the late Massena B. Murray, Oklahoma's then Director of Conservation, of his application for an order establishing rules for the developing, producing, and testing of wells producing natural gas and other hydrocarbons from the Chester, Hoover, Morrow and Tonkawa Formations, in portions of Ellis, Harper, and Beaver Counties, known and referred to as the Laverne Field. (This field had been adjudged to be producing from common sources of supply, and 640-acre drilling and spacing units established in it, by previous order of the Commission).

In the same cause, Colorado Interstate Gas Company, a major purchaser of gas in the Laverne Field, filed a pleading termed a "counter-application"; and Shell Oil Company, a lessee and operator in the Field, filed what was termed a "cross-Petition".

In the other cause, CD14026, Sinclair Oil & Gas Company, joined by other lessees and operators, Gulf Oil Corporation, Sun Oil Company, Sunray Mid-Continent Oil Company, and The Ohio Oil Company, filed a separate application for an order establishing rules for the same above-described common sources of supply.

The controversial difference in the respective sets of rules proposed by those filing, and/or supporting, the above-mentioned pleadings is in the formula they advocated for determining the amount of production that should be allowed the Laverne Field's wells (hereinafter referred to as "allowables") under Tit. 52 O.S.1951 and 1961 § 239, which reads as follows:

"Whenever the full production from any common source of supply of nat-

ural gas in this state is in excess of the market demands, then any person, firm or corporation, having the right to drill into and produce gas from any such common source of supply, may take therefrom *only such proportion* of the natural *gas that may be marketed* without waste, as *the natural flow of the well* or wells owned or controlled by any such person, firm or corporation *bears to the total natural flow* of such common source of supply *having due regard to the acreage drained by each well,* so as to prevent any such person, firm or corporation securing *any unfair proportion* of the gas *therefrom; * *. The said commission is authorized and directed to prescribe rules and regulations for the determination of the natural flow* of any such well or wells, and to regulate the taking of natural gas from any or all such common sources of supply within the state, so as to prevent waste, protect the interests of the public, and of all those having a right to produce therefrom, *and to prevent unreasonable discrimination in favor of* any one such common source of supply as against another." (Emphasis ours).

The formula proposed by Murray (hereinafter referred to merely as the "Director") for arriving at the monthly allowables of the Laverne Field's wells had in it the so-called "factors" of potential, acreage, and pressure. Using it, each well's allowable (except those in special categories) would be determined by multiplying the number of acres in its drilling or spacing unit by the square root of said well's potential, times its shut-in pressure, times the Field's total current allowable (less minimum allowables) divided by the Field's total acreage (excluding minimum wells) times the total of the potentials and shut-in pressures of all the Field's wells.

The formula proposed by Colorado Interstate Gas Company, (hereinafter referred to merely as "CIG") was similar to, and employed the same factors as that of the Director, except that for its pressure factor it used the wells' shut-in pressures diminished by $\frac{9}{10}$ths of the arithmetic average shut-in pressure of all of the Field's wells.

The formula proposed by Shell Oil Company, which, like the other oil companies, will hereinafter be referred to merely by the first word in their names, was the one contained in rules, which, as amended, are in force in that part of the common source of supply of the Mocane Field known as the Morrow Sand.

The formula proposed by Sinclair and its co-applicants, sometimes referred to as the "Sinclair formula", contemplated each well having an allowable arrived at by multiplying its unit acreage by the number of feet of productive sand in its well bore, times the field's current allowable divided by the summation of the field's remaining wells' unit acreage and their well bore productive pay.

At hearings before the Commission, on the above-mentioned pleadings, more than 1200 pages of testimony and many exhibits were introduced pro and con of the various proposed formulas, over a period of several months. In the first of the above-mentioned orders (Order No. 44,850) it thereafter entered, the Commission promulgated a number of detailed rules for operations in the Laverne Field that include the above-described formula proposed by the Director. In the subsequent order involved herein (Order No. 45,145) the rules promulgated in Order No. 44,850 were extended to an additional area underlain by part of the same common source of supply covered by the latter order. Sinclair, and the other companies appearing as plaintiffs in error in two of the appeals considered herein, (Nos. 39667 and 39668) perfected them from Order No. 44,850. Also from said order, Pan American Petroleum Corporation, a lessee and operator in the area covered by Order No. 45,145, has perfected the third appeal considered herein, on the theory that, if Order No. 44,850 is herein

vacated, Order No. 45,145 (quoting its brief) "* * * would also fall."

In referring to the various arguments for reversal of Order No. 44,850, advanced by plaintiffs in error in separate briefs, one group will hereafter be referred to as "Sinclair et al".

All of the plaintiffs in error take similar positions with regard to the appealed order's validity being jeopardized, and/or destroyed, by the incorporation of "potential" as a factor in its allowable formula. They all cite one or both of the cases of Choctaw Gas Co. v. Corporation Comm., Okl., 295 P.2d 800, and Anderson-Prichard Oil Corp. v. Corporation Comm., 207 Okl. 686, 252 P.2d 450, in support of their position.

The first cited case is no authority *against* the allowable formula incorporated in the order appealed from, *or for* a formula such as espoused by Sinclair, and others, that is based solely upon acre-feet of the productive sands, formations, or intervals. The allowable order in the Choctaw Gas Company case prescribed an allowable formula, which like the one in question here, included "potential" as a factor. However, as in its said appeal, said Gas Company raised certain questions concerning its efficacy and operation—and it could be plainly demonstrated that, *even on the productive acreage basis* it relied upon, *said company had produced much more than its proportionate share of the gas* there involved—we found it unnecessary in our opinion in that case, to describe the formula, or to deal with the arguments concerning its merits or demerits. In the light of this revelation and explanation, it will be seen that our use of the acreage hypothesis in that opinion was merely for the purpose of brevity, and to obviate dealing with arguments which our treatment of the fundamental issues in the case, rendered immaterial. It is also obvious that such use of such hypothesis constituted, in no manner whatsoever, our approval or endorsement of a formula based solely on productive acreage, over one that might employ other factors. Nor does the Choctaw Gas

Company case stand for the proposition that a valid allowable formula must include a factor representing gas in place, whose ownership is declared, by Tit. 52 O.S.1961 § 231 (cited by plaintiffs in error) to be in "* * * the owners, or gas lessees, of the surface under which it is located in its original state."

■ In its brief, the Commission cites Panhandle Eastern Pipe Line Co. v. Corporation Comm., Okl., 285 P.2d 847, as holding that whatever attributes of ownership may attach under sec. 231, supra, these must yield to the paramount power of the State to prevent waste and protect correlative rights. Whether this characterization of our opinion in that case is correct or not, it has been recognized in this jurisdiction since at least as early as Rich v. Doneghey, 71 Okl. 204, 177 P. 86, 3 A.L.R. 352, that the owner of land has *only* a *qualified* ownership in the oil and gas beneath it, and that his right to reduce said migratory minerals to possession by drilling and producing, is subject to legislative control. And, this legislative control is administered through the Corporation Commission. Thus, although Tit. 52 O.S.1961 § 232, says, inter alia, that: "* * * The drilling of a gas well or wells by any owner or lessee of the surface shall be regarded as reducing to possession his share of such gas as is shown by his well", we think no one familiar with the present development and interpretation of our proration laws would contend that, as soon as such an owner has penetrated a common reservoir of gas with a well, he may do as he wishes with all of the reservoir's gas that it may be possible to reach, or siphon off, through the medium of that well's bore.

In the present consolidated cases, there was an abundance of substantial and competent evidence to the effect that the formula proposed by the Director, and adopted in the order appealed from, would allow the well on each spacing unit in the Laverne Field to recover all of said well's "recoverable reserves".

The inference in some of plaintiffs in error's arguments that the Commission's previous order establishing 640-acre spacing in the Laverne field was an adjudication that each well on each unit of that size and shape will effectively drain the unit of all of the gas originally lying in place under it, is not based upon fact. Nor is geological opinion, that wells in a certain field will drain as large an area as 640 acres, under conditions existing generally in said area's reservoir, tantamount to a representation that all of the gas sand, or formation, under every part of every unit in the field will contribute gas to a particular well, or wells, on said unit. And, if such representations were made, it would have less likelihood of veracity, where the units are of the size and shape of a surveyed surface section of land, and the wells are a mile apart. It was shown, and we know, as a matter of more or less common knowledge, that drainage patterns of oil and gas wells do not conform to, nor coincide with, section lines, especially as to wells penetrating a common reservoir, whose drainage patterns are subject to shaping by changing conditions in the reservoir, and the interplay of these conditions with those in and around the bottom of the well bore. We took some note of such conditions and truths in the Panhandle Eastern Pipe Line Company case, supra. Also, there was undisputed evidence introduced before the Commission in this case, which reasonably supports the conclusion that one well producing from reservoirs like those involved here (though it may drain all of the free gas from the unit, that may be recovered by such a centrally-located well, and that will go into a pressurized pipeline) will never recover *all* of the gas *in place* under its unit.

■ Furthermore, there was no unequivocal proof as to how much gas remained in place in said reservoir as a whole, or in the particular portions thereof underlying the respective spacing units, at the time of the hearings. There was abundant competent evidence repudiating the assumption or hypothesis, under Sinclair's pro-

posed "productive" acreage formula, that the thickness of pay sand found in the various spacing units' wells did not extend under all of the surface acreage of each unit, and that, if it did, it would not have the same degree of productivity as the segments found in the well bores. In view of the foregoing, those who opposed the allowable formula adopted by the Commission, have no proved ground for contending that, in not being founded solely upon the basis of gas in place, the formula and the order appealed from tends to deprive them of property without due process of law. Furthermore, the conceded statutory basis of such orders, section 239, supra, makes no mention of "gas in place." It does refer to " * * * gas that may be marketed * * *" and we think that a reading of said section as a whole, as well as the very nature of the fixing of allowables, places the emphasis on free gas, and/or gas that can be recovered by the subject well or wells, rather than gas, which, though remaining in place, as it originally accumulated, or came into being, is not free to, or will not, for some one or more of a number of reasons that may be plausibly advanced by geologists, or petroleum or gas reservoir engineers, travel to a one-to-the-section well bore to be produced. Gas in place does not become the subject of an allowable-fixing device, nor constitute the wherewithal for meeting market demands—until it is capable of being produced by the permissible well or wells. And if, when there is ample market demand for a common reservoir's gas, the production of the wells, through which most of the reservoirs' contents *naturally* flow, is drastically restricted, to await attempts, over an extended time period in the uncertain future (when the market demand may conceivably become substantially diminished or non-existent) to procure through the reservoir's other wells possessing lesser capabilities, a quantity of gas that some geologists or gas engineers may calculate by admittedly questionable measuring devices or dimensions, as being in place under the latter wells' spacing units—with the detrimental reser-

voir conditions that the testimony indicates such attempted reversal of natural processes may bring about—the cause of conservation, and of underground waste prevention, is not served. In placing first consideration and emphasis in sec. 239, supra, upon "natural flow" rather than upon "acreage drained", we think our State's Legislature, consistent with its apparent attitude toward economic waste in the drilling of what would appear to be unnecessary wells (noted in the Panhandle Eastern Pipeline Company case, supra) has regarded the necessity of draining such reservoirs with a minimum of waste, as more important than attempting to guarantee to any owner or operator that his permitted well or wells will produce the precise quantity of gas which some may predict to be in place under the entire surface area of his land, or drilling unit. In this connection, it will be noted that sec. 239, supra, does not limit one having the right to produce natural gas from a common source of supply to " * * * only such portion * * * " of the reservoir's supply " * * * as will permit each developed lease *to ultimately produce approximately the amount of gas underlying such developed lease * * * "* (emphasis ours) as does the Kansas Statute, G.S.1959 Supp. 55–703, quoted in Northern Natural Gas Co. v. State Corporation Comm., 188 Kan. 355, 362 P.2d 599, 606, 607, cited by plaintiffs in error. In view of the foregoing, it is our opinion that the formula incorporated in the rules adopted by the Commission, in the order appealed from, did not render said order invalid merely because it was not based upon a factor of gas in place (as distinguished from recoverable reserves), or upon so-called "sand picks." And we reject, as inapposite, and inconclusive, all arguments plaintiffs in error attempt to support by citations of testimony to the effect that the adopted formula will not afford an opportunity to produce all "gas in place" through the medium of one well to each 640 acres. Furthermore, we do not think that, on the basis of some of the competent evidence, the fact that some of the wells may be treated by sand fracking ex-

cludes the adopted formula as a lawful means of ascertaining the "natural flow" proportion, in such a manner as to prevent those possessing correlative rights from " * * * securing any unfair proportion" of the common reservoir's gas. The evidence as to *recoverable* gas in place, or reserves, though some of it is rather technical and is probably more meaningful to those who more often hear and examine such evidence (like the members of the Corporation Commission) than this Court, furnishes a substantial basis for conclusions contrary to the contentions of plaintiffs in error.

We next consider the argument in connection with which Anderson-Prichard Oil Corp. v. Corporation Comm., supra, is cited, viz.: Use of "potential", as a factor in the formula, renders it invalid. In the cited case, this court, held in the second paragraph of its syllabus:

> "The term 'natural flow of the well' as that term is employed in Title 52 O.S. 1951 §§ 232, 233 and 239, means the total output of the well from natural causes."

In the body of the opinion (252 P.2d p. 453), we said:

> " * * * Under Sec. 239, supra, the Commission is authorized to establish rules and regulations for determining the natural flow of the wells * * *.
>
> \* \* \* \* \* \*
>
> (252 P.2d p. 454) "It will be observed that applicant's formula is based upon certain 'potentials' of its wells, which means no more than 'the daily rate of flow.' *The statute* does not base allowables upon potentials, but *bases them upon the natural flow of the wells. Natural flow,* as that term is employed in the Act, *means* the *total volume of gas which a given well will produce.* Moreover, *the statute does not delineate the course the Commission must take to determine the natural flow of a gas well,* or wells, as they bear to the total natural flow of the common source of supply. As we

have seen, *the statute* authorizes and directs *the Commission to prescribe rules and regulations for the determination of the natural flow* of wells producing from a common source of supply to the end that the rights of all producers be protected. As we have heretofore indicated, applicant's position is untenable in that it bases its asserted rights upon the 'potentials' of its wells, which means no more than 'the daily rate of flow' and as we have seen the statute does not limit the take of gas to the 'natural flow of the well per day' but is based upon its 'natural flow'. To determine this volume of gas the Commission may properly consider the ascertained area of the reservoir, based upon productive acres underlying each lease, the thickness of the producing formation, and the percentage of effective porosity and its permeability. * * *." (Emphasis ours).

After carefully examining all of the testimony in the present case, we do not think that there is any crucial difference in meaning between the term "recoverable reserves", as used by the witnesses who testified 'in support of a "potential" formula, and the term "natural flow", as used in the above-quoted opinion and the statute (section 239, supra), especially as these terms are applied to one-well, mile-square units. (In this connection, notice the quotation from Atlantic Oil Production Co. v. Railroad Comm., Tex.Civ.App., 85 S.W.2d 655). As thus applied, both refer to the total flow of gas which a well will naturally produce during its foreseeable life, or before abandonment. As we have already indicated, there was an abundance of competent and substantial evidence showing that this "natural flow" can most accurately be ascertained, with reference to the common reservoirs, or sources of supply, involved herein, by use of a formula which includes the factors of both potential and pressure. There is substantial support in the record for the conclusion that, under the particular conditions existing in this field, uncom-

pensated drainage and water saturation (which terms are definitely related to correlative rights and waste) can best be kept at a minimum by limiting the operation of the potential factor, and including pressure as a factor, like the adopted formula does. The considerations involved, figured in the testimony of both the Director, the Conservation Department's engineer, and others.

The fact that the evidence reveals that no physical, or underground, waste is now occurring in the Field, or under operation of the Mocane Rules, as emphasized by some of the plaintiffs in error, does not demonstrate any invalidity in the order appealed from, nor lack of jurisdiction in the Commission to enter it. The testimony of more than one witness was undisputed that more than one kind of waste would occur if the wells in the Laverne Field were allowed to flow without restriction. And there was undisputed evidence that in the Mocane Field, and heretofore in the Laverne Field, portions of the market demand for gas from those fields have been forever lost to those fields' production, that could have been utilized, if their wells had been assigned realistic allowables, more in keeping with their abilities to produce. (At least one witness characterized this as "economic waste.") Of course, financial loss to a field's royalty owners accompanies such losses to its producers, as well as others of this State's beneficiaries of gas revenue where their gas purchasers find it necessary to supply part of their market demand by purchases in other States. Whether this might possibly result in a form of discrimination between Oklahoma fields, or common sources of supply, within the statutory prohibition (sec. 239, supra), is not necessary for us to decide, in concluding that entry of the order herein appealed from was well within the Commission's jurisdiction.

We know of no sound reason why the Commission should any more be prevented from changing a common source of supply (in an orderly and legally prescribed manner) from one allowable formula to an-

other (which in the light of changing conditions and more and better knowledge about the reservoir will more likely fulfill the objects of waste prevention and protection of correlative rights) than it is prevented from changing well-spacing sizes and/or patterns, or well-spaced areas, in the light of new knowledge accumulated by the progressive development of such reservoirs. In this connection, see Panhandle Eastern Pipe Line Co. v. Corporation Comm., supra, Application of Peppers Refining Co., Okl., 272 P.2d 416, 424, and Brown v. Humble Oil & Refining Co., 126 Tex. 296, 83 S.W.2d 935, 87 S.W.2d 1069, 99 A.L.R. 1107, 1118, 101 A.L.R. 1393, in which the Court said, inter alia:

"* * * The commission, in order to prevent waste, has the power to limit the rate of flow in the same way that it has the power to regulate spacing. See Champlin Refining Co. v. Corporation Commission, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062, 86 A.L.R. 403; Danciger Oil & Refining Co. v. Railroad Commission (Tex.Civ.App.) 49 S.W.2d 837. * * *"

This brings us to the contentions presented by plaintiffs in error, Sinclair et al., under "Proposition II" of their initial brief. The first of these is that the findings contained in Order No. 44850 are "too vague and insufficient" to support said Order. In this connection, they point to the provision of Art. IX, sec. 22, of the Oklahoma Constitution that:

"The Corporation Commission shall, whenever an appeal is taken therefrom, file with the record of the case, and as a part thereof, a written statement of the reasons upon which the action appealed from was based, and such statement shall be read and considered by the Supreme Court, upon disposing of the appeal. * * *"

The subject order contains the following findings, inter alia:

"3. The Commission finds that the supply of natural gas from the various separate common sources of supply herein is in excess of the market demand therefor and that in order to *prevent waste, and protect correlative rights*, field rules and regulations are necessary.

"4. The Commission has carefully considered all the respective formulas proposed and has carefully considered all of the evidence in support of and in opposition to each proposed formula. The Commission is of the opinion that the formula which will most nearly accomplish *all lawful and desirable results* throughout the extent and life of the various separate common source(s) of supply in the matter of allocating gas to the individual wells in the Chester, Hoover, Morrow, and Tonkawa Formations, is a formula based upon acreage times the square root of potential times the pressure of the individual well. * * *." (Emphasis ours).

Other than repeating some of the statements, or ideas, we have already dealt with, Sinclair et al's initial brief says:

"The findings of fact by the Commission are completely devoid of any statement or conclusion that the formula adopted will equitably divide up or allocate the gas, or that it will, or how it will, give to each operator an opportunity to produce its rightful share of the gas or prevent one operator from appropriating more than its rightful share of the gas, which purpose and result is required by 52 O.S.1951, §§ 231, 232 and 239, as held in Choctaw Gas Company case, supra.

*   *   *   *   *   *

"These findings, * * * only show the necessity of adopting field rules, not what allocation formula will equitably divide the gas.

*   *   *   *   *   *

"The question of what are the lawful and desirable results and how this formula will accomplish such is not stated or answered.

*   *   *   *   *   *

"It is difficult, if not impossible to evaluate or determine on what basis the formula was adopted or what the Commission felt it would accomplish or intend to accomplish. We cannot determine from the Commission's findings whether or not the order accomplishes lawful and desirable results, nor can we show where the Commission was wrong in making such assumption, as it cannot be determined what they felt were the necessary, lawful and desirable results. * * *."

On the other hand, the Commission's brief says there is nothing vague or indefinite in the quoted findings; that the term "all lawful and desirable results" in paragraph "4", above, can only refer back to the lawful and desirable results of waste prevention and protection of correlative rights, referred to in paragraph "3". The Commission further contends that the same general argument Sinclair et al. make here was rejected in Cities Service Gas Co. v. Peerless Oil & Gas Co., 203 Okl. 35, 220 P.2d 279, 283, p. 291, in which this court said that orders, like the one in question, are "legislative" in character. The Commission says it is no more required, in such an order, to spell out, with particularity, the reasons why its action will prevent waste and protect correlative rights, than is the Legislature required to set forth its reasons for enacting a statute, in the statute itself.

Without accepting, or rejecting en toto, the arguments in either of the adversaries' briefs, and, assuming, without deciding, that Art. IX, sec. 22, supra, is applicable to an order like the one in question, we think its quoted findings are neither too vague nor fatally indefinite. As the Supreme Court of Texas said in Halbouty v. Railroad Comm., (Tex.) 357 S.W.2d 364, concerning that State's Railroad Commission, proceedings before this State's Commission are rather informal, and their validity is not tested by all of the technical rules that obtain in court trials. With reference to the allowable formula, the subject order involves some very technical subjects, in which principles of mathematics, engineering, and physics are involved, that were explained to, and heard by, the Commission during several days, and many pages, of testimony. Sinclair et al's citation of the Choctaw Gas Company case, supra, no more bolsters their last quoted argument than it does those hereinbefore dealt with. We think it would have been impractical, and would have added nothing to the validity of the order, if the Commission had undertaken to detail therein the many considerations that went into making up the findings announced therein. We think the Order's findings are sufficient under the circumstances here.

Upon oral argument of this cause, plaintiffs in error, in addition to the authorities referred to in their briefs, and Northern National Gas Co. v. State Corp. Comm., hereinbefore fully dealt with supra, cited the following cases: Continental Oil Co. v. Oil Conservation Comm., 70 N.M. 310, 373 P.2d 809, Halbouty v. Railroad Comm., supra, and Atlantic Oil Production Co. v. Railroad Comm., of Texas, supra. We reject as inapplicable to allowable formula orders of the Corporation Commission of this State (as hereinbefore indicated) any inference, or conclusion, that may be drawn from the cited New Mexico case that it is necessary for said Commission, in a valid order changing a formula already in force, to make specific findings that the superseded formula does not protect correlative rights. Nor do we think that under sec. 239, supra, the Commission must find, or delineate, in its allowable order, the number of acre-feet of productive gas formation in the field involved and in its respective spacing units, if there is substantial evidence that application of the formula therein adopted, will allow production of each unit's recoverable reserves *in the "proportion" or ratio* which such reserves bear to the total recoverable reserves of the field. Here there was ample evidence that the adopted formula will do this in the sense in which the term "recoverable reserves" is used herein.

We do not concur in all specific statements appearing in the cited opinions of the Supreme Court of Texas, but their general import conforms to the principle that an owner of land overlaying a common reservoir of gas should not be prevented from producing his fair share of the recoverable gas in said reservoir. In our opinion, none of the above-cited cases demonstrate cause for reversing the order before us. On the basis of the findings set forth in said order, supported by substantial evidence (as we have indicated) and uncontroverted by unequivocal proof to the contrary, we must conclude that it does not impinge, nor violate, the correlative rights of the plaintiffs in error to produce their approximate shares of the recoverable reserves in the common source of supply involved.

As we have determined that none of the arguments presented by plaintiffs in error show sufficient grounds for reversing the order appealed from herein, the same is hereby affirmed.