BLACKBIRD, Justice.
 

 The order herein appealed from was a part of a “Report * * *” entered by this State’s Corporation Commission (hereinafter referred to simply as the “Commission”) on November 24, 1964, as its No. 56884 in its Cause CD No. 20343. The principal feature of the Order, in so far as concerns this appeal, is that it established 640-acre drilling and spacing units for the production of natural gas, and gas condensate, from the Mississippi Lime formation under an area covering 35 sections of land south of the town of Goltry, and on all sides of the point approximately 12 miles west of Enid, Oklahoma, where the western boundary of Garfield County meets the common boundary of Alfalfa and
 
 *944
 
 Major Counties. The area thus spaced is depicted on the part of the plat incorporated herein, designated by the letter
 
 “C”.
 
 By previous order of the Commission such units had already been established for such production from the same common source of supply in the area designated “A” on said plat. The first one of these orders, referred to in the present proceedings as the “basic order”, was numbered 55060 and entered in May, 1964.
 

 [[Image here]]
 

 In less than 4 months after the Commission had entered this first 640-acre spacing order No. 55060, supra, it entered, in another well spacing proceeding, its Order No. 54686, establishing 80-acre drilling and spacing units for the production of
 
 oil and
 
 gas from the Mississippi Lime in the area marked by the letter “B” on this same plat, or map. There are 40 to 50 wells,
 
 *945
 
 of which Shell Oil Company has IS, producing oil and other liquid hydro-carbons from the Mississippi Lime in area B.
 

 The proceedings, in which the subject order No. 56884, supra, was entered, were commenced on the Application of Shell Oil Company (hereinafter referred to merely as “Shell” or “Applicant”) which, together with Champlin Oil Company, owns oil and gas leases on between SO and 60 percent of the land in area C. The Application specifically referred to Shell’s encountering the Mississippi Lime at an approximate depth of 6330 feet below the surface, in its Shell-Davis well, and characterized this as the discovery of “a common source of supply of gas and gas condensate.” Besides Champlin Oil Company which drilled and operates the Champlin-Davis, Champ-lin-Butler, Champlin-Koshn, and Champ-lin-Johnson wells (all of whose locations are shown by spots on the within map), Shell’s application was supported by Humble Oil Company, another major lessee and operator in the area, and by Harper Oil Company.
 

 An “Answer” opposing the Application was filed with the Commission on behalf of “* * * a majority of the landowners, oil, gas and royalty owners in and to the land described in the caption of this cause, * * * ”.
 
 This
 
 pleading contained allegations, among others, to the effect that the Shell-Davis well was an oil, rather than a gas, well, that the proposed spacing would permit one well,
 
 whether oil or gas,
 
 to hold leases on an entire section of land
 
 as to all oil and/or gas formations underlying it,
 
 and would compel a division of the royalty from
 
 every stick zvell
 
 among
 
 all
 
 of the owners of minerals in each such section, in violation of Tit. 52 O.S.1961, sec. 87.1 (c)’s prohibition against spacing units larger than 80 acres, in common sources of oil supply, lying less than 9,990 feet, and more than 5,000 feet, below
 
 the
 
 surface, and would constitute the taking of private property without due process and just compensation, in violation of both the State and Federal Constitutions.
 

 At the Commission’s hearing, which commenced in July and concluded in October, 1964, both those in favor of the application (referred to collectively herein as “applicants”) and those opposing it (referred to collectively as “protestants”) introduced oral testimony and documentary evidence. The principal question sought to be resolved thereby appears to have been whether this area C, proposed for 640-acre spacing, was underlain by a common source of supply, or reservoir, and, if so, was it a gas reservoir (like area A) or an oil, or. oil and gas reservoir (like area B) ? In written findings preceding the order in its report, the Commission found that the Shell-Davis, Shell-Burdick, Aladdin-Pecha, and Champlin-Davis wells were gas, and gas condensate, wells, which penetrated a new and separate common source of supply.
 

 In their present appeal from said order,, protestants’ arguments for reversal are advanced under five propositions, but the efficacy of all of them depends primarily on the merits of their first “Proposition”, which is:
 

 “The Order is not sustained by substantial evidence.” Under this proposition, protestants. direct our attention to-certain portions of the testimony of the-two expert witnesses, Mr. Tinker and Mr. Bartgis, who testified for the applicants,, and of the expert, Mr. Murta, and one landowner, Mr. Tyner, who testified for the protestants; and they conclude with an announcement of their failure to find' any substantial evidence to show that the-subject 35 sections of land, is a “predominantly gas area.” They attempt to support their said “finding”, as follows: (1) They assert that the producing wells
 
 outside
 
 this area C are all oil wells, which they say is a “good indication” that any future wells drilled
 
 within
 
 said area will also
 
 be oil
 
 wells; and (2) They assert there are no production records on a single-well in said area, and call attention to the-fact that no wells of any kind have been: drilled in said area’s eastern half. We-
 
 *946
 
 have thoroughly examined the record in this case, and have found therefrom, that the statements referred to are either incorrect, or are otherwise inadequate to constitute ground for reversing the order appealed from.
 

 Some of the undisputed facts established in the Commission’s hearing were that the Shell-Davis and Shell-Burdick wells were drilled as “wild cats”, almost simultaneously, and as a part of a 14-well development program on which Shell embarked following Champlin’s completion, early in the year 1964, of the Champlin-LeCrone well, a Mississippi Lime producer in Section 10, Township 23, Range 10 West — (about the center of area B shown on the within plat) — which witness Tinker referred to as the Mississippi Lime’s “oil patch”; that the Mississippi Lime underlies all of Major County, most of Garfield County, and the southern ^rds of Alfalfa County, and extends to the Anadarko Basin with outcroppings in North Texas, but there is no pipe line to receive gas from this formation closer than one 28 miles from area C that pipes gas from the Elk City Field; that the Mississippi Lime formation is unusual in that it underlies such a large area, but has very low porosity (2 or 3% as compared with an average of 15% in sand reservoirs) and, at the same time, has very few dry holes, and its oil and gas is contained in, and connected with well bores penetrating it, by fracture systems; that when the drilling of a well into this Lime formation (which averages approximately 400 to 500 feet thick in this area) is completed, these fractures are enlarged, and modified, by the pumping, through perforations in the well’s pipe, of 10 to 20 thousand barrels of water under high pressure ; that, through these enlarged and modified fractures, the formation’s fluid and gaseous contents can flow to the well bores rapidly, with the result that their initial production potentials are large, but deplete rather rapidly.
 

 By way of demonstrating that wells in area C may be expected to initially produce some fluid gas distillate, along with their natural gas production, during the early stages of their production, particularly while their fracture treatment water is still being recovered, or cleaned out, from the hole, Mr. Tinker testified that the Shell-Davis well, which was completed in May, 1964, had an “open flow” fluid production, at the beginning of its “cleaning out” period, of 250 barrels per day and a gas-oil ratio (GOR) of 11,000 to 1. He further testified that, on a later test, this well’s fluid production had decreased to 31.2 barrels of distillate, of an API gravity of 61 degrees, per day, its open flow gas production was 25,040,000 cubic feet per day, and its gas-oil ratio had increased to 88,000 to 1, while, on the same day, the Shell-Burdick well produced approximately only 2 barrels of distillate, of an API gravity of 59.4 degrees, during a 6-hour period, and had an open flow potential of 9,581,000,000 cubic feet per day and a gas-oil ratio of 138,250 to 1. When Mr. Tinker was asked, on cross examination, whether the Shell-Davis well (which had been shut in, since being tested) would continue to produce 32 barrels of fluid per day, he stated that he didn’t know how long it would continue to produce distillate, or how much such production would be. He further testified: “ * * * until we get a market and are allowed to get adequate tests on these wells, we can’t do all the necessary calculations to determine the ultimate.” Mr. Tinker further testified, among other things, that the Alladin-Jor-dan well (in Section 29, Twp. 24 North, Rge. 9 West) — which is shown as a dry hole on maps of the area — was not, in his opinion, an adequate test of the Mississippi Lime production because it penetrated only two feet of said formation at that location. He further testified that there is no other common source of supply encountered, or producing, near the Shell-Davis and Shell-Burdick wells, though he revealed that the Aladdin-Pecha well, which was completed as long ago as August 15, 1961, and has been shut in since, originally pro
 
 *947
 
 duced 48 barrels of fluid per day from the Chester formation, which lies on top of the Mississippi Lime. He further stated that when this well was deepened into the Mississippi Lime, it had a calculated open flow of 1.5 million cubic feet of gas and 24 barrels of condensate per day, and its gas-oil ratio was 62,500 to 1. He further testified that a recent deepening of this well has increased its gas production, and the last report he had on it, showed its prqduction to be 3½ million cubic feet of gas per day, with a gas-oil ratio of 15,000 to 1. He said the well is now estimated to have a calculated open flow “on the order” of 15,000,000 cubic feet of gas per day.
 

 In his testimony, Mr. Bartgis, one of Champlin’s Petroleum Engineers, described tests that had been conducted on his Company’s Champlin-Davis well. He testified, among other things, that when it was first completed, it was allowed to flow more than
 
 60
 
 hours for cleaning out, but recovered no measurable quantity of liquid carbons; that its gas-oil ratios on its first three “rates of flow” were 16,000 to 1, 18,000 to 1, and 46,000 to 1, respectively, and, on its fourth rate of flow, no liquids were produced. He further stated that the well was then shut in for approximately a week, then opened and allowed to flow 24 hours for stabilization, and then, on August 7th and 8th, 1964, it was tested. He further stated that, at this test, some liquids did come from the well, but its gas-oil ratio was 38,200 to 1.
 

 By way of explaining why such a well may produce some liquid, after producing only gas when it is first opened, after being shut in, witness Bartgis testified that when it is shut in, its liquids gravitate to the bottom, and, when opened, the gas above it flows out first before the liquid is picked up and brought to the surface with the gas around, and intermingled with, it. When asked his opinion as to whether the Champlin-Davis was a gas, or an oil, well, he stated that it was “definitely a gas well.” Mr. Tinker had expressed an almost identical opinion of the Shell-Davis and Shell-Burdick wells. He also testified that the oil production nearest area C occurs at the Humble-Maxey well in Section 18, Twp. 23 N., Rge. 9 West.
 

 When asked for a definition of a gas field, the witness Tinker stated that it is one that produces primarily gaseous hydro-carbons with a “substantial” gas-oil ratio, together with liquids in smaller amounts, of a “fairly high” API gravity. He further stated, in substance, that he believed . the standard for “substantial” gas-oil ratios, and “fairly high” API gravity, under his definition, is, in this jurisdiction, 15,000, or more, to 1 for gas-oil ratios, and 50 degrees, or higher, for API gravities. In this connection, the attorney for Shell later called the Commission’s attention to paragraph 12 of the findings preceding its previous order No. 55060, supra, which reads:
 

 “To list the orders of this Commission which have set forth the criteria in classifying a well as either a gas well or an oil well would probably fill a typewritten page. Almost without exception the criteria used in classifying a well as a gas well is one which has a gas-oil ratio of 15,000-1 which produces hydro-carbons with 50 degrees API gravity or higher.”
 

 Protestants’ witness, Mr. Murta, testified, in substance, that there
 
 could
 
 be areas, among the quarter sections of area C, on which no wells have yet been drilled, that would be productive of oil only, or oil and gas, or neither; and he expressed the opinion that, without more extensive production records on the 4 principal producing wells in the area, and with no wells at all on a large portion-of its eastern side, there was not srtfficient evidence on which to base 640-acre spacing of the whole area. In his testimony, applicants’ witness Tinker, conceded that it could not accurately be predicted what would be found in any well drilled as far away from one of these producers as one mile, and that the only way to determine this would be to drill such wells. Both he and Bartgis recognized
 
 *948
 
 that the volume of gas reserves in this area cannot he determined until more of its expanse has exploratory drilling, and more productive history can be obtained. Both were of the opinion, however, that one well to each section of land would adequately drain all of the “economically recoverable” gas from the Mississippi Lime formation, though they could not predict the percentage of this mineral that might be left in the formation after such a well had reached the end of its productive life.
 

 The applicants’ testimony that it costs $85,000 to $110,000 to complete a well in the area was uncontradicted. Also uncontra-dicted was their testimony to the effect that efforts to find either an intrastate purchaser, or someone in the interstate gas transmission business, to construct a pipe line to the field, and purchase its gas, before a reserve supply of such gas for at least a 20-year period has been indicated in said field, have been, and will be, unsuccessful. Also undisputed was the testimony to the effect that the companies holding leases on the majority of the acreage in the area will not attempt a drilling program to prove such reserves, without the wide spacing applied for. Mr. Tinker testified that without more production history than has been accumulated by the 4 principal wells already drilled, and without knowing what their allowable production will be, he could not predict how long it would take such a well to pay for itself. He followed up his opinion that one well on a section of land would recover all of the economically recoverable gas from the Mississippi Lime underlying it, would protect correlative rights, and result in an orderly development of the area, by stating that a second well would be an unnecessary well, and that to drill such a well on each quarter section in the area would be economic waste. He also testified, in substance, that producing more than one well on a section of land would not necessarily result in any more gas royalty being paid to the owners of minerals underlying it (even in the immediate future), than producing only one well on such acreage, since this depends upon allowables, and that the promulgation of field rules would not change the situation, as allowables are governed by purchaser nominations and are allocated upon a lease, or unit, rather than upon a per-well, basis.
 

 As will be seen, the evidence introduced by applicants did not dispel the possibility, which protestants’ witness Murta testified to, that some future wells drilled into the Mississippi Lime under area C may be unquestioned oil, rather than gas, producers. Nor did they contradict the, truth that whether or not such will be the case, can be definitely established only by the drilling of future wells. However, in view of the history of his study of the Mississippi Lime in the area, which the applicants’ witness Mr. Tinker described in his testimony, we cannot say that his opinion, concerning the pertinent matters involved, does not constitute the “substantial evidence” necessary to support Commission orders, such as the one appealed from. The opinions of both of applicants’ witnesses were ostensibly supported by more detailed studies than were shown to have supported the testimony of one of the same witnesses in Crews et ux. v. Champlin Oil & Refining Co. et al., Okl., 413 P.2d 508, in which we said the following : “ * * * we cannot say that the statements and expressions of opinion, by the applicant’s witness, do not constitute ’substantial evidence’, * * * ”. Their testimony is not insufficient, under the definition of “substantial evidence” this Court adhere to. See Chenoweth v. Pan American Petroleum Corp., Okl., 382 P.2d 743. We think protestants’ evidence very convincingly precludes inferring from the fact that the wells penetrating the Mississippi Lime (referred to as being in its “oil patch”) west and southwest of area C, are all oil wells, that the portion of the same formation underlying area C may also be classified as an oil-producing area for well-spacing purposes. The best evidence on this subject — developed from the only wells that have been drilled in this area — indicates the contrary, i. e., it is a predominantly gas producing area. Of course, this is not to say,
 
 *949
 
 or predict, that no oil producing wells will ever be drilled in area C. If evidence developed in the future justifies it, one or more parts of the area may properly be spaced for oil production under the 1963 Amendment to our Oil and Gas Conservation Statutes referred to as the “Combination Reservoir Bill”, and noted in applicants’ answer brief. See S.L.1963, Chap. 121, p. 158; Tit. 52 O.S.1963 and 1965 Supp., sec. 87.1(a). In this connection, neither the ■evidence in this case, nor the wording of the challenged order purporting to establish a pattern of spacing only for
 
 gas
 
 wells, supports the extravagant charges and dire pre•dictions made under Propositions No. “2” .and “5” of protestants’ initial brief concerning said Order’s effect on the possible pro■duction of
 
 oil
 
 in area C. We find no merit in any of protestants’ arguments under these propositions.
 

 Protestants’ arguments, under their “Proposition No. 4” that the order appealed from “violates both the Federal and State Constitutions by permitting the taking of private property without due process of law and without compensation”, appears also to be based upon the false assumption, or premise, that said order authorizes the pro■duction of
 
 oil
 
 by the drilling and operation of only one well on each section of land in the area it spaces “for the production of gas and gas condensate.” They say:
 

 “One of the most damaging effects of the 640-acre spacing order is that the landowner having the producing well only gets ⅜2nd of the production, which means that he has to give up ¾⅛ of his
 
 oil
 
 royalty without any compensation. 'This is true even when the permitted well for the unit is located on the edge thereof, as is the case of two of the four wells involved (240), where there could be little or no drainage of
 
 oil
 
 from under the other three farms (222).” (Emphasis ours).
 

 It is true that paragraph “5” of the order • communitizes “all royalty interests”, and ^provides that “ * * * each royalty owner within any unit shall participate in the royalty from the well drilled thereon in the relation that * * * (his) acreage * * bears to the total acreage in the unit,” but the order says
 
 nothing
 
 about such provisions applying to
 
 oil production;
 
 and, as already indicated, the order, as a whole, purports to apply only to “the production of gas and gas condensate.” As protestants make no contention that any gas well drilled, as prescribed by the order, will drain gas from any of their land without their being paid adequate compensation therefor under the provisions of the order, their argument — pertaining as it does only to oil production — is irrelevant. They quote what we said in Application of Peppers Refining Company, Okl., 272 P.2d 416, 424, concerning the importance of securing to mineral owners their ratable share of production and preventing underground waste as compared to securing for those, who do the drilling and producing, maximum profits from such operations. In the same opinion (p. 424), however, we recognized that:
 

 “It may be good policy for the Commission, in initially considering the well-spacing of a new field, about which the geological data is not complete or is subject to revision after said exploration, to proceed with caution and prescribe that the wells be located comparatively far apart, * * *.”
 

 There can be no question but that area C is a “new field” in the respect that it “ * * * contains predominantly gas underlying a different area * * * (sec. 87.1(a), supra), or is an area different from area A, and any other area herein shown to have theretofore been spaced. Mr. Tinker’s testimony definitely demonstrates the wisdom of wide spacing in a new field. One excerpt from it is as follows:
 

 “Q * * * What if this was spaced on 80 acres and it’s drilled eight wells to the section; just assume that somebody would do that, eight wells per section, that’s in the order of $700,000.00 to $800,-000.00?
 

 “A Yes, sir.
 

 
 *950
 

 “Q
 
 Once you’ve drilled those eight wells and you find you were wrong, it was gas, there’s no way of undoing one of those wells as far as getting your money back, is there?
 

 “A Not only is there no way of undoing the wells; there’s also
 
 no way of undoing the damage that would be done to the reservoir by trying to make an oil well.
 

 “Q You mean wasting gas, the reservoir energy, is that what you mean?
 

 “A You’ve got eight wells in there and while you’re determining what they’re going to he, there’s going to be some blown and what have you until they get tested.
 

 “Q If you have a well that produces six barrels of liquid and a million cubic feet of gas and your oil allowable is, say, just for illustration, is 30 barrels a day, how many million cubic feet are you going to be producing in order to produce your allowable?
 

 “A
 
 Six barrels of oil and you’re going to have a million cubic feet of gas with that?
 

 “Q Yes, like the Davis ?
 

 “A You will produce something like five million cubic feet a day.
 

 “Q So in order to get your 30 barrels worth, about what, $90.00 ?
 

 “A Yes.
 

 “Q You’d produce five million cubic feet of gas worth $750.00?
 

 “A That’s correct.
 

 “Q And in the process, if you had more than one well per section or if you had four wells per section, do you have an opinion as to what that might do to the reservoir energy down in the oil column, if there is an oil column?
 

 “A It would, I think, adversely affect it
 
 if there is an oil column, yes, sir.” (Emphasis ours.)
 

 As to protestants’ inference that the Commission erred in including so much land in area C when no wells have yet been drilled in a large portion of its eastern half, it was indicated by both testimony and documentary evidence that this portion of the area has dry holes east, south, and north of it. Although there was evidence that the Mississippi Lime has a down-dip and an up-dip, from a southwesterly direction toward the northeast, through area C, no direct or specific evidence was ever introduced of any attempted correlation between the logs, of these dry holes and those of area C’s. four hereinbefore named producers, 3½, and more, miles west of them. However, protestants make no claim that an area must have a producing well on each section of land in it, before it can be correctly covered by a well-spacing order; nor do they cite any provision of law such as that contained in sec. 287.4 of the Unitization Law (Tit. 52 O.S.1961, section 287.1ff) requiring the boundaries of such an area to be defined “by actual drilling operations * * As to such a requirement, we said in Panhandle Eastern Pipe Line Co. v. Corporation Comm., Okl., 285 P.2d 847, 853, that none had “ * * * been enacted by our Legislature.” We also recognized the risk,, without such a requirement (and under wide spacing) of some owners of mineral interests being enabled to share, at least, for a time, in production to which subsequently-developed knowledge (whether gained from! wells later drilled on smaller units, or otherwise) indicates they were never entitled, because of the (subsequently established) un-productivity of the locus of their interests-But, in said opinion (p. 853) we had also, noted that the prevention of wasteful, excessive drilling (as well as the protection of correlative rights) was a primary Legislative consideration in the enactment of the original Well Spacing Act. And, we concluded that it has been the policy of the Legislature to tolerate the lesser hazard (i. e., the possibility that some production, or production proceeds, may be taken from some owners rightfully entitled to it, and transmitted to others not so entitled) “ * * * in preference to the greater hazard to the greater number of owners, and the State in the dissipation of its natural re
 
 *951
 
 sources by excessive drilling.” Notice also our reference to this matter in Sinclair Oil & Gas Co. v. Corp. Comm., Okl., 378 P.2d 847, 853. Here, there is no evidence that anyone will not receive that portion of area C’s production to which he is entitled, if such production is gas, as there is substantial evidence to indicate it will be. In view of all pertinent considerations, the fact that no wells have been drilled on the large eastern part of area C presents no ground for reversing the order appealed from.
 

 Under Protestants’ “Proposition No. .3” they refer to written “agreements”, which the evidence introduced at the Commission’s hearing, tended to show Shell had signed, with some of the owners of the minerals in area C. By the wording of these instruments, one of which was introduced in evidence, the owners signing them authorized Shell to attribute the acreage, or interests, they had leased to it under respective quarter sections of land, to an allowable for a single well on such 160-acre tracts, and, in conjunction therewith, “authorized” Shell to apply to the Corporation Commission for an allowable for such well larger than those authorized for wells penetrating the Mississippi Lime common source of supply on 80-acre well spacing units. By the terms of said instruments, these mineral owners purported to agree that “In the event * * Shell completed such wells, and, by such attribution, obtained from the Commission such allowables for them:
 

 “ * * * equal to or greater than one hundred eighty percent (180%) of the well allowable which would be authorized or permitted based upon 80-acre spacing, SHELL shall not be obligated to drill any additional well or wells on Leased Premises into the common source of supply in which such well is completed, and such well shall constitute full and adequate development of Leased Premises as to the common source of supply in which such well is completed. * *
 

 From the testimony of the two mineral ■owners, who testified they had signed such agreements with a Shell representative, it is conceivable that they believed, when they signed them, that they were binding contracts, but protestants’ counsel has failed to point out how, or in what manner, the execution of such agreements legally bound Shell to apply for, or obtain, the allowables therein described. On their face, these so-called agreements contained no promise to do so, and, in the absence of any consideration for the mineral owners’ signing of them, it is unnecessary to further discuss the position expressed in protestants’ initial brief as follows:
 

 “There can be no question that the order of the Corporation Commission completely relieves the oil companies from any and all obligations
 
 they might have
 
 under the 160-acre contracts which they induced a number of the landowners and royalty owners to sign, but the signing landowners remain bound thereby as fully as ever.” (Emphasis ours.)
 

 As the arguments submitted by protestants have shown no cause for reversing the order appealed from, the same is hereby affirmed.